**CAMBRIA–STOLTZ ENTERPRISES**
**and Camstol Corporation,**
**Appellants,**

v.

**TNT INVESTMENTS, Appellee.**

Superior Court of Pennsylvania.

Argued Jan. 26, 2000.
Filed Feb. 28, 2000.

John J. Miravich, Reading, for Cambria-Stoltz Enterprises, appellant.

Stephen Price, Reading, for appellee.

Before POPOVICH, EAKIN and OLSZEWSKI, JJ.

OLSZEWSKI, J.:

¶ 1 Cambria–Stoltz Enterprises ("Cambria–Stoltz") and CAMSTOL Corporation ("Camstol")[1] appeal from the order entered against them in the Court of Common Pleas. We affirm.

¶ 2 On June 1, 1993, Cambria–Stoltz, consisting of Mr. Joseph Cambria and Mr. Michael Cambria, entered into two five-year leases with TNT Investments ("TNT"), consisting of Mr. Kevin Timochenko and Mr. Joseph Templin. Appellants leased 2 North Sixth Street to use as a sandwich shop ("sandwich shop property"), and 4–6 North Sixth Street for use as a café ("café property"). Before executing a written lease for either property, appellants made more than $92,000 worth of improvements to both. TNT knew of the improvements and did not object.

¶ 3 The written leases for both properties were virtually identical, though the amounts of the security deposits varied. TNT required a $700 deposit for the sandwich shop property and a $1,325 deposit for the café property. TNT, however, acknowledged in the leases that it waived the security deposits because of the vast improvements the Cambrias made to the properties.

¶ 4 The leases contained several provisions now at issue. First, the leases provided that Cambria–Stoltz would name TNT as co-insured on the liability insurance for both properties. Moreover, the leases entitled TNT to see a certificate from the insurer proving such. Another provision provided that in the event of a breach by Cambria–Stoltz, TNT could give

---

1. CAMSTOL is the holder of the liquor license for Cambria–Stoltz's café property.

written notice to Cambria–Stoltz, then terminate the lease twenty days later. Further, the leases specified that TNT's subsequent acceptance of rent from Cambria–Stoltz would not waive the breach. The leases also contained a provision that TNT would not allow another similar business to rent space in the complex "within reason." The leases also prohibited Cambria–Stoltz from assigning or subletting either property without TNT's written consent. Lastly, the leases provided that any improvements Cambria–Stoltz made to the property became TNT's property.

¶ 5 Trouble did not appear on the horizon until the summer of 1994, when the sandwich shop began having problems. The Cambrias wanted to concentrate on the café, so they sublet the sandwich shop property to Mr. Mike Waselus,[2] who began running an ice cream shop there. In February 1995, the Cambrias abandoned the sandwich shop property because of poor business. In March 1995, TNT leased a nearby property to a Subway, a competitor in the sub business. The Cambrias did complain to TNT in October 1994 regarding the construction of the Subway, but TNT did not respond.

¶ 6 In November 1994, an agent for TNT, Ms. Susan Grim, notified Cambria–Stoltz by mail that it had to pay the security deposits,[3] name TNT as co-insured, and forward "this" to TNT. The Cambrias failed to respond within twenty days, and on November 29, 1994, pursuant to the default language in the lease, TNT sent notice of termination to Cambria–Stoltz and told it that the lease was now a month-to-month lease. Mr. Joseph Cambria admitted that he ignored TNT's request for a certificate of insurance because he assumed that the insurance company had already named TNT as co-insured (though this was not the case). In fact, at trial, the only insurance document offered was dated December 16, 1994, as was the certificate of proof. This was after TNT's termination of the lease. Further, the certificate of proof listed "Metropolitan Management Corp." as co-insured, not TNT. Mr. Timochenko and Mr. Templin also owned Metropolitan, but neither Mr. Timochenko nor Mr. Templin told the Cambrias to list Metropolitan as the co-insured. Further, the title to the café property was either in TNT's name, Mr. Timochenko's name, or Mr. Templin's name, but not in Metropolitan's name.

¶ 7 As noted above, Cambria abandoned the sandwich shop property in February 1995, but remained in possession of the café property. In February, the parties began to dispute the heating problems in the café. Mr. Carmelo Cambria signed, with Mr. Joseph Cambria's knowledge, an agreement on a napkin that TNT could turn the heat off by February 14, 1995, by which time the Cambrias would have had a new heating system installed. TNT did turn off the heat, but the Cambrias had access to the heating system and could turn it back on if they wanted to.

¶ 8 On November 30, 1995, TNT notified Cambria–Stoltz that it was terminating its month-to-month lease of the café property, effective December 31, 1995. Cambria–Stoltz, however, remained in possession of the property until January 18, 1997, without TNT's permission, and paid rent into an escrow account from January to December 1996. In February 1996 TNT told the Cambrias that it should inform them in writing of any problems. The Cambrias did not do so, and on January 18, 1997, a ceiling tile fell and injured a café employee. An inspection revealed structural damage, and the Cambrias closed the café and ceased making rent payments.

---

**2.** It is unclear whether Cambria–Stoltz obtained TNT's permission for this sublet, but no evidence appears in the record that it did. The trial court found that Cambria–Stoltz breached the lease in doing so. *See* Memorandum Opinion, 8/3/99, at 12.

**3.** The court below found, and we agree, that TNT waived the security deposits because of Cambria–Stoltz's improvements to the property.

¶9 On January 2, 1997, TNT filed a Complaint in Ejectment to evict the Cambrias. On about the same date, Cambria–Stoltz filed an action in equity seeking both enforcement of the leases and damages. The court below consolidated these two matters on February 14, 1997. A bench trial commenced on November 19, 1997, and Camstol Corporation was added as a plaintiff on December 9, 1997. The court below heard testimony on November 19, 20, and 24, 1997, and April 14 and 15, 1998. On December 31, 1998, the court below held that TNT had the right to possession of the café property and the rent payments in the escrow account. The court evicted Cambria–Stoltz. The court also refused to grant damages to Cambria–Stoltz. This appeal followed.

¶10 Appellants raise four issues on appeal: (1) whether the trial court erred in holding that Cambria–Stoltz breached the lease by failing to provide TNT with proof of insurance; (2) whether the trial court erred in holding that Cambria–Stoltz acquiesced to a month-to-month lease; (3) whether the trial court erred in failing to award damages to Cambria–Stoltz for TNT's failure to heat the premises or fix the roof; and (4) whether the trial court erred when it failed to award Cambria–Stoltz damages under breach of contract, breach of covenant of quiet enjoyment, or unjust enrichment. We discuss each in turn.

¶11 We first note that this is an equity matter. "Our scope of review in an equity matter is very limited. We must accept the trial court's findings of fact, and cannot reverse the trial court's determination absent a clear abuse of discretion or error of law." *Gurenlian v. Gurenlian*, 407 Pa.Super. 102, 595 A.2d 145, 147 (1991) (citing *Walley v. Iraca*, 360 Pa.Super. 436, 520 A.2d 886, 889 (1987)).

¶12 Appellants first argue that the court below erred in holding that Cambria–Stoltz breached the lease. They point to two errors: first, they say that the court's factual findings were erroneous be-

cause it disregarded the testimony of appellants' witnesses, and second, they contend that the court below erred in finding the breach was material.

¶13 Regarding the court's factual findings, our review is quite limited. "[W]here the chancellor's findings are largely dependent upon the credibility of witnesses, the findings are entitled to particular weight, as the chancellor had the opportunity to observe the demeanor of the witnesses." *Walley*, 520 A.2d at 889 (citing *Dudash v. Dudash*, 313 Pa.Super. 547, 460 A.2d 323, 326 (1983)). We will not disturb the trial court's findings simply because appellants would have preferred another outcome.

¶14 Regarding the breach, we look to the lease itself. "[L]eases between landlords and tenants are governed by contract law." *Stonehedge Square Ltd. v. Movie Merchants, Inc.*, 454 Pa.Super. 468, 685 A.2d 1019, 1025 (1996) (citing *Pugh v. Holmes*, 486 Pa. 272, 405 A.2d 897, 903 (1979)), aff'd, 552 Pa. 412, 715 A.2d 1082 (1998). Further, we "'will not imply a contract different than that which the parties have expressly adopted.'" *Id.* (quoting *Hutchison v. Sunbeam Coal Corp.*, 513 Pa. 192, 519 A.2d 385, 388 (1986)). "This rule is particularly apt when reviewing a contract involving two parties of relatively equal bargaining power, as is generally the case in a commercial lease setting." *Id.* Here, provision 9 in both leases stated: "The Tenants agree to take out ... public liability insurance against property damage or personal injury.... The Landlord shall be named as co-insured on all insurance policies and shall be entitled to a certificate of the insurer showing said coverage being in effect." The first provision of the contract clearly identifies "TNT Investments" as "Landlord." Appellants argue that they maintained liability insurance as required, but merely confused who was to be named co-insured. Appellants also contend that listing Metropolitan as co-insured was not a material breach be-

cause Mr. Timochenko and Mr. Templin managed both TNT and Metropolitan. Appellants further argue that they assumed that their insurance company mailed the proof to Metropolitan, even after receiving Ms. Grim's letter.

¶ 15 The court below found that appellants did not name TNT as co-insured, nor did appellants' insurance company provide the requested proof of insurance to TNT. *See* Memorandum Opinion, 8/3/99, at 9–10. Appellants did not prove that the certificate was ever placed in the mail, and appellants' documents proving they were insured were dated December 16, 1994, well after Ms. Grim's November 7 letter. *See id.* In fact, there is no evidence that TNT was ever listed as co-insured. *See id.* While it is true that appellants maintained insurance, the name of the co-insured is of utmost importance. Naming the wrong party co-insured was not a small mistake or an incidental error. This was a willful act; even after receiving Ms. Grim's letter, appellants ignored TNT's request. Moreover, naming the wrong party as co-insured could have resulted in dire circumstances for TNT had there been a liability suit against them, as they were technically uninsured. Appellants thus breached the lease, so now we must determine whether the forfeiture clause is valid.

¶ 16 While it is certainly true that "forfeitures are strongly disfavored," *Liazis v. Kosta, Inc.*, 421 Pa.Super. 502, 618 A.2d 450, 455 (1992), they are not void *per se.* We must "review the contract in its entirety, and a provision will not be construed to result in a forfeiture unless no other reasonable construction is possible." *Kalina v. Eckert*, 345 Pa.Super. 220, 497 A.2d 1384, 1385 (1985) (citations omitted). Provision 8 in both leases, entitled "Default," reads, in part:

> if there shall be a default in the performance of any other covenant [other than rent], agreement or condition herein contained ... on the part of the Tenant for more than twenty (20) days after

written notice of such default is given by the Landlord, this Lease, if the Landlord so elects, shall thereupon become null and void.

This is clearly a forfeiture clause. We must thus determine whether the clause is enforceable.

¶ 17 Ms. Grim sent appellants a letter requesting proof of insurance on November 7. When they failed to respond by November 29, TNT sent them a written notice of termination, pursuant to provision 8, and notified appellants that they could remain as month-to-month tenants. While appellants argue that Ms. Grim's letter was not sufficient notice, the trial court found that it was, and we agree. The letter says: "please name us (TNT Investments) as co-insured.... Please forward this to TNT Investments." TNT Investments requested proof of insurance, which appellants failed to provide. While appellants may feel that the result is harsh, they signed a commercial lease. "The parties to a lease must be able to rely on the terms for which they bargained in an arms-length transaction." *Ross v. Gulf Oil Corp.*, 361 Pa.Super. 228, 522 A.2d 97, 99 (1987). Here, two sophisticated parties signed a lease, and now we will hold them to it. Appellants breached the lease, and the forfeiture clause is enforceable.

¶ 18 Appellants' second argument follows directly from the first; they contend that the court below erred in holding that, after November 29, their tenancy was month-to-month. They argue that the court relied solely on testimony that Mr. Joseph Cambria told outsiders that his lease was month-to-month. This is incorrect. As noted above, provision 8 allowed TNT to change the terms of appellants' tenancy once appellants breached. TNT notified appellants in writing that their tenancy was month-to-month. Appellants did not dispute that, but remained in the café property. They therefore accepted a month-to-month tenancy.

¶ 19 Appellants contend, however, that they did not surrender the lease in writing and thus did not accept a month-to-month tenancy. They cite two sources for support: *202 Marketplace v. Evans Products Co.*, 824 F.2d 1363 (3d Cir.1987), and the Statute of Frauds, 68 P.S. § 250.203. We look at each in turn.

¶ 20 We first note that Third Circuit Court of Appeals decisions "are not binding on Pennsylvania courts, even when a federal question is involved." *Martin v. Hale Products, Inc.*, 699 A.2d 1283, 1287 (Pa.Super.1997). Nor is the Third Circuit's interpretation of state law binding on us, though it is persuasive. *See id.* We turn to *202 Marketplace* with that in mind.

¶ 21 It is immediately clear that the facts of *202 Marketplace* are inapposite to those in the instant matter. In *202 Marketplace*, two companies disputed whether one party orally terminated the lease, or alternatively, whether one party breached the lease. *See 202 Marketplace*, 824 F.2d at 1365. The Third Circuit held that appellant had not breached the lease because the provision in question was an implied covenant rather than an express one. *See id.* at 1367–68. The court refused to allow forfeiture where the covenant was implied, and further held that appellant could not surrender its interest without a writing. *See id.* In the case before us, however, we have already held that appellants breached an express covenant. Because appellants breached the lease, they cannot now argue that they had to relinquish their rights in writing. Their breach negated their rights as to that lease. Because it is not on point, we need not determine whether we will adopt the Third Circuit's reasoning in *202 Marketplace*.

¶ 22 Appellants also rely on a statute of frauds provision, 68 P.S. § 250.203, which reads: "No lease of any real property made ... for more than three years shall be ... surrendered except in writing ... *unless such ... surrendering shall result from operation of law*." 68 P.S.

§ 250.203 (emphasis added). Appellants ignore the highlighted provision, which we find dispositive here. Black's Law Dictionary defines "operation of law" as "[t]he means by which a right or a liability is created for a party regardless of the party's actual intent." *Black's Law Dictionary* 1119 (7 th Ed.1999). Here, appellants breached the lease and thus the law created a liability for them for the breach, regardless of whether appellants intended that. As we stated above, appellants' scenario is illogical. In their scenario, a party would only lose its rights under a lease if it breached and then acknowledged that breach in writing. A breach alone would not be enough to relinquish rights. We disagree. While this provision of the statute of frauds protects a non-breaching party, it will not protect a breaching party. Appellants' second claim is without merit.

¶ 23 Third, appellants argue that the court below erred when it failed to find that TNT breached the leases and that appellants were entitled to damages. Appellants combine several contentions under this heading. First, they argue that TNT breached the leases in two ways: (1) TNT breached the covenant of quiet enjoyment by failing to fix the café property's roof from 1995 through 1997 and by turning off the heat in 1995; and (2) TNT breached the no-compete clause in the sandwich shop property lease by leasing to a competitor in 1994. Appellants claim the court below erred in not awarding them damages for each breach.

¶ 24 First, we need not address appellants' claims regarding any events in 1995 and 1996 because the court below held that appellants did not adequately plead those issues. *See* Memorandum Opinion, 8/3/99, at 12–13. Appellants failed to state in their pleadings that they were requesting damages for 1995 and 1996, but did request damages for 1997. *See id.* While expert testimony may have established damages for 1995 and 1996, the court held that, because appellants' failure to plead such matters prejudiced TNT, appellants

were barred from proving such damages. This is the concept of variance, which is where there is a:

> Difference between the allegations made and the proof shown, not in the sense that there is a failure of proof, but that, contrary to the fundamental principle of good pleading and practice, the proof fails to materially correspond to the allegations.
>
> * * *
>
> [A]mong the most typical and most damaging variance problems ... are those cases where the proof at trial establishes a cause of action that was not alleged in the party's pleadings.

*Reynolds v. Thomas Jefferson Univ. Hosp.*, 450 Pa.Super. 327, 676 A.2d 1205, 1209 (1996) (citations omitted). "[A] variance is not material if it causes no prejudice to the adverse party." *Id.* at 1210 (citations omitted). Here, the court below found that the variance was material, *i.e.*, that it caused prejudice to the adverse party. *See* Memorandum Opinion, 8/3/99, at 12–13. Appellants fail to address this finding in their brief; instead they argue that TNT breached several covenants in 1995, 1996, and 1997, then state that the court "should have concluded that the Cambrias are entitled to recover damages." Appellants' brief, at 32–33. They never argue that the court erred in finding a variance, nor do they argue that the variance was not prejudicial. Because they fail to dispute this finding, we hold that the court did not err in its determination that appellants were not entitled to damages for 1995 and 1996.

¶ 25 Thus, appellants' remaining claims are the 1997 damages for the roof problems at the café property and the 1994 damages for TNT's alleged breach of the no-compete clause in the sandwich shop property lease. We deal with each in turn. First, regarding the 1997 roof damage, we agree with the trial court that appellants remained in the building despite TNT's requests that they vacate the prem-

ises. TNT informed appellants in November 1996 that, effective December 31, 1996, their month-to-month tenancy was at an end. When appellants refused to vacate the premises, TNT initiated an action in ejectment on January 2, 1997, to evict appellants. The 1997 damage occurred after TNT brought the action. We will not grant damages to appellants when they remained on the property against TNT's will. Thus, the trial court did not err in refusing to grant damages for 1997. Regarding the no-compete clause, the court below found that appellants breached the lease in the summer of 1994 by subletting the property. *See* Memorandum Opinion, 8/3/99, at 12. Therefore, TNT's subsequent lease of a nearby property to a competitor was not a breach because the lease was already void. Further, appellants abandoned the property in February 1995, and the competitor signed a lease beginning in March 1995. Thus, we conclude that the court below did not err in refusing to grant damages to appellants for any alleged breaches on TNT's part.

¶ 26 Lastly, appellants claim that the court below erred when it failed to find that appellants were entitled to recover for the value of the improvements they made to premises based on the theory of unjust enrichment. To recover based on unjust enrichment, there must be, logically enough, (1) an enrichment and (2) an injustice if the unenriched party does not recover for that enrichment. *See Chesney v. Stevens*, 435 Pa.Super. 71, 644 A.2d 1240, 1243 n. 4 (1994) (citations omitted). "[T]he most significant requirement for recover is that the enrichment of the defendant is unjust." *Id.* The court below, however, did not find that TNT was unjustly enriched; instead it found that appellants had not proven damages. *See* Memorandum Opinion, 8/3/99, at 15. At trial, appellants testified that they spent $92,000 on improvements, but they never provided the court with any testimony as to whether that increased the value of the property. We have previously held that "the amount

which ... tenants may recover ... is the value of the benefit they have conferred upon ... landlord." *Chesney*, 644 A.2d at 1245. In *Chesney*, this Court then affirmed the trial court's decision to award the increase in fair market value of the property after the tenant's improvements. *See id.* Appellants do not argue that the fair market value is the improper evaluation for damages, nor do they point us to a case that has awarded the value of the improvements rather than the increase in fair market value. Because appellants did not prove that their improvements increased the fair market value of the house, we need not determine whether TNT was unjustly enriched. Thus, appellants' final claim is without merit.

¶ 27 Judgment affirmed.

¶ 28 POPOVICH, J., Concurs in the Result.