Edward ANCHEL, Individually, and Edward Anchel, Derivatively, on behalf of Altec Lansing Technologies, Inc. and its Shareholders, Appellant,

v.

John SHEA, Tommyca Freadman, Christopher Smith, John McCartney, Altec Lansing Technologies, Inc., Wafra Investment Advisory Group, Inc., Soundco Capital, Inc., Appellees.

Altec Lansing Technologies, Inc., John Shea, Tommyca Freadman, Christopher Smith, John McCartney, Appellees,

v.

Edward Anchel, Appellant.

Altec Lansing Technologies, Inc., John Shea, Tommyca Freadman, Christopher Smith, John McCartney, Appellants,

v.

Edward Anchel, Appellee.

Edward Anchel, Individually, and Edward Anchel, Derivatively on behalf of Altec Lansing Technologies, Inc. and its Shareholders, Appellees,

v.

John Shea, Tommyca Freadman, Christopher Smith, John McCartney, Altec Lansing Technologies, Inc., Wafra Investment Advisory Group, Inc., and Soundco Capital, Inc., Appellants.

Superior Court of Pennsylvania.

Argued June 7, 2000.
Filed Oct. 4, 2000.
Reargument Denied Dec. 5, 2000.

Robert L. Byer, Pittsburgh, for Shea.

Patrick J. O'Connor, Philadelphia, for Anchel.

BEFORE: JOHNSON, STEVENS, and BECK, JJ.

JOHNSON, J.:

¶ 1 This case involves the consolidated appeals and cross appeals of two feuding factions on the board of directors of Altec Lansing Technologies, Inc. Each party appeals an order for preliminary injunction entered on December 13, 1999, which purportedly returned the status quo of the corporation as it existed prior to the alleg-

edly wrongful conduct of each party. Among the issues presented for our review is whether the duties imposed upon a corporate shareholder by a voting trust agreement restrict or obviate his duty to the corporation when acting as a director under section 1712 of the Business Corporations Law. *See* 15 Pa.C.S. § 1712(a). For the following reasons, we affirm in part and reverse in part.

¶ 2 Altec Lansing Technologies, Inc. ("Altec") is a Pennsylvania corporation that produces a wide variety of high-tech audio and multimedia products. Altec, formerly Sparkomatic Corporation, was incorporated in 1956. Edward Anchel founded Altec with his father and has been involved in the company since its inception. On May 16, 1994, due to financial difficulties afflicting Altec, the Anchel family sold a 49% interest in Altec for $7 million to Soundco Capital, Inc. ("Soundco"), an outside investor. Soundco's 49% interest in Altec consisted of stock with voting rights equal to 49% of the outstanding stock of Altec. Anchel retained 51% of the voting rights in Altec's stock.

¶ 3 Pursuant to this transaction with Soundco, Altec revised or created several corporate governance documents: (1) an amendment to and restatement of the articles of incorporation ("articles") that were filed with Pennsylvania's Department of State on May 18, 1994; (2) a restatement of the corporation's by-laws executed in May of 1994; and (3) a Stockholders' Agreement executed May 16, 1994. These documents effectuated, among other things, changes in the composition of the board of directors. The Stockholders' Agreement provided that the corporation would have a board of directors composed of not less than five members. Soundco had the right to appoint two of the directors, and Anchel would appoint three directors. The Stockholders' Agreement also provided that if the number of directors was increased, the appointing power would remain proportional. Soundco appointed John Shea and Christopher Smith to the board. Anchel appointed himself, Ronald Dion, and Tommyca Freadman to the board. In 1996, two independent directors were added—John McCartney and Charles Parente—bringing the total number of directors on the board to seven.

¶ 4 The corporate governance documents prescribe, *inter alia*, notice and voting requirements to be followed when the Board of Directors engages in a "Significant Transaction." A "Significant Transaction" is, *inter alia*, a transaction with a value equal to or exceeding $500,000. When a board member proposes a "Significant Transaction," heightened notice and voting requirements are put into effect.

¶ 5 Freadman, one of Anchel's designees on the board and an employee of Altec, entered into a Voting Trust Agreement on May 17, 1994. In pertinent part, the Voting Trust Agreement and Freadman's employment agreement required Freadman to deposit his stock in Altec (which Freadman received pursuant to his employment at Altec) into a trust under which Anchel would have the sole right to vote such stock so long as Anchel remained as CEO. (The briefs are unclear regarding the type of voting stock Freadman received as an employee and the extent to which his holding impacted the voting rights of Anchel and Soundco). Freadman's employment agreement also provided that Freadman would remain on the board of directors, so long as Altec employed him.

¶ 6 Pursuant to an employment agreement executed on May 16, 1994, Anchel served as CEO and President of Altec. Anchel's employment agreement was due to expire in May of 1999. McCartney, one of the independent directors, testified that, under Anchel, the company's financial performance was deteriorating, and the relationship between Anchel and the Soundco representatives (i.e. Shea and Smith) went from strained to extremely contentious. The record indicates that the Soundco representatives had concerns about Anchel's performance as CEO from at least 1997.

Anchel was also losing the support of one of his own appointed directors, Freadman.

¶ 7 Nevertheless, at an April 27, 1999 meeting, the board unanimously voted to renew Anchel's employment contract as CEO and President for three years with a base salary of $525,000. Although disputed by the parties, the trial court found that, at this meeting, the board adopted the additional provision that Anchel may be removed from his position as CEO by a *simple majority vote* of the board.

¶ 8 Shea, one of the Soundco representatives on the board, called a special meeting of the board of directors to be held on October 26, 1999, and he sent notice of this meeting two business days prior to its scheduled date. At the October 26th board meeting, the board removed Anchel as CEO and President by a simple majority vote. Shea, Smith, McCartney, and Freadman voted in favor of Anchel's removal. Anchel, Parente, and Dion voted against Anchel's removal. Anchel was appointed as Chairman and was still to receive his $525,000 annual salary. Freadman was appointed interim CEO. The same majority of the board voted to revoke the Voting Trust Agreement.

¶ 9 Anchel attempted to call a special shareholders' meeting on November 12, 1999, but postponed it until November 15, 1999, because a quorum did not appear on November 12. At the November 15th shareholders' meeting, Anchel, as the majority shareholder, voted to remove Freadman from the board of directors and replace him with David Anchel—Anchel's son and an Altec employee. Later that same day, at a board meeting, Anchel, David Anchel, Parente, and Dion voted to rescind the actions taken at the October 26, 1999 board meeting. They voted, *inter alia,* to re-appoint Anchel as CEO, renew Anchel's employment agreement, terminate Freadman as interim CEO, remove Freadman as a director, and reinstate the Voting Trust Agreement. The Soundco representatives and Freadman were not present at this November 15th board meeting.

¶ 10 On October 26, 1999, Anchel filed a complaint in the Pike County Court of Common Pleas, on behalf of himself and derivatively on behalf of Altec, against directors Shea, Freadman, Smith, and McCartney ("Soundco group"). He named Altec as a nominal defendant. Anchel sought a temporary restraining order and preliminary injunction to enjoin the Soundco group from, among other things, acting upon Anchel's removal as CEO and President. On November 16, 1999, the Soundco group and Altec filed a complaint against Anchel seeking to enjoin Anchel from acting upon the resolutions purportedly taken at the November 15, 1999 meeting, including Anchel's reinstatement as CEO. They sought a declaration that those actions were taken unlawfully and improperly.

¶ 11 On December 13, 1999, the Court of Common Pleas of Pike County, the Honorable Harold A. Thomson, Jr., President Judge, entered an order granting, in part, each party's request for preliminary injunction. Judge Thomson sought to reinstate the status quo prior to the controversy by nullifying the actions taken at the October 26th meeting and the November 15th meeting. In pertinent part, Judge Thomson's order reinstated Anchel as President and CEO of Altec Lansing, reinstated Freadman as a director, imposed a supermajority voting requirement on all actions of the board, and required that all meetings of shareholders and directors be noticed in a verifiable format. Both parties appealed and cross-appealed. We will review the issues brought by the Soundco group first. We will then review the issues Anchel brings on appeal.

■ ¶ 12 The Soundco group and Altec raise three issues for our review:

1. Where a stockholders' agreement imposes special notice and voting requirements for actions of the board of directors that are "[S]ignificant [T]ransactions" and defines a "Significant Transaction" to be a "trans-

action ... with a value of $500,000 or more," did the trial court err in holding that an action of the board that removed the president and chief executive officer and made him chairman with no reduction of his $525,000 annual salary was a "Significant Transaction"?

2. Did the trial court err in entering an overbroad preliminary injunction that imposed a supermajority voting requirement on all actions of a corporate board of directors despite its own factual finding that there had been no violation by any party of a voting requirement imposed upon that board and despite the fact that no party requested such a remedy?

3. Did the trial court err when it held that a corporate director is precluded from voting in what he understands to be the best interests of the corporation because, in his separate role as a corporate shareholder, he is party to a voting trust related only to his shares of stock?

Brief for Appellant at 3.

[O]ur review of the grant ... of a preliminary injunction is limited to determining whether there were any apparently reasonable grounds for the action of the trial court. We will interfere with the trial court's decisions regarding a preliminary injunction only if there exist no grounds in the record to support the decree, or the rule of law relied upon was palpably erroneous or misapplied. It must be stressed that our review of a decision regarding a preliminary injunction does not reach the merits of the controversy.

*Palladinetti v. Penn Distribs., Inc.*, 695 A.2d 855, 863 n. 11 (Pa.Super.1997) (citations and quotation marks omitted). "The court which is to exercise discretion in the matter of issuance of an injunction is the trial court and not the appellate court and the action of the trial court may be reviewed on appeal only in the case of a clear abuse of discretion but not otherwise."

*Maritrans GP, Inc. v. Pepper, Hamilton & Scheetz*, 529 Pa. 241, 602 A.2d 1277, 1286 (1992).

¶ 13 "The purpose of a preliminary injunction is to preserve the status quo as it exists *or previously existed before the acts complained of,* thereby preventing irreparable injury or gross injustice." *Id.* (internal citations omitted). To establish the right to preliminary injunctive relief, the moving party carries the burden of showing:

(1) that relief is necessary to prevent immediate and irreparable harm which cannot be compensated by damages; (2) that greater injury will occur from refusing the injunction than from granting it; (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; (4) that the alleged wrong is manifest, and the injunction is reasonably suited to abate it; and (5) that the plaintiff's right to relief is clear.

*Cappiello v. Duca*, 449 Pa.Super. 100, 672 A.2d 1373, 1376 (1996) (quoting *Lewis v. City of Harrisburg*, 158 Pa.Cmwlth. 318, 631 A.2d 807, 810 (1993)). " 'An injury is regarded as 'irreparable' if it will cause damage which can be estimated only by conjecture and not by an accurate pecuniary standard.' " *West Penn Specialty MSO, Inc. v. Nolan*, 737 A.2d 295, 299 (Pa.Super.1999) (quoting *Sovereign Bank v. Harper*, 449 Pa.Super. 578, 674 A.2d 1085, 1091 (1996)) (stating that impending loss of business opportunity or disruption of established business relations that would result in incalculable damage may qualify as "irreparable injury").

¶ 14 A preliminary injunction is an extraordinary, interim remedy that should not be issued unless the moving party's right to relief is clear and the wrong to be remedied is manifest. *See Cappiello*, 672 A.2d at 1376. *See also Vulcanized Rubber & Plastics Co. v. Scheckter*, 400 Pa. 405, 162 A.2d 400, 404 (1960) (stating that, particularly in cases where

parties are struggling for control of a corporation, "complainant must establish that it is his clear legal right, not doubtful or uncertain, to the specific relief sought; otherwise the preliminary injunction will be dissolved"). Moreover, the "preliminary injunction, if issued, should be no broader than is necessary for the petitioner's interim protection." *Three County Servs. Co. v. Philadelphia Inquirer,* 337 Pa.Super. 241, 486 A.2d 997, 1000 (1985). " 'Furthermore, when a preliminary injunction contains mandatory provisions which will require a change in the position of the parties, it should be granted even more sparingly than one which is merely prohibitory.' " *Id.* (quoting *Zebra v. School Dist. of City of Pittsburgh,* 449 Pa. 432, 296 A.2d 748, 750 (1972)).

¶ 15 Soundco's first allegation of error concerns that part of the preliminary injunction that reinstated Anchel as CEO of Altec. As a basis for its decision, the trial court concluded that Anchel's removal from his position as CEO at the October 26th board meeting was a "Significant Transaction" and was, therefore, subject to heightened notice requirements. Preliminary Findings and Conclusions, 12/13/99, at 8–9. The trial court then concluded that the October 26th meeting was not properly noticed and, based on the defective notice, the action taken at that meeting to remove Anchel was without effect. *Id.* Accordingly, the trial court entered a preliminary injunction reinstating Anchel as CEO and President "retroactively to October 26th, immediately prior to the purported removal." *Id.* at 9.

¶ 16 Our review of the trial court's order reinstating Anchel focuses on whether the board action removing Anchel on October 26th was indeed a "Significant Transaction." The definition of "Significant Transaction" can be found in three corporate governance documents, including the articles, Restated By–Laws of Sparkomatic Corporation ("by-laws"), and Stockholders' Agreement. The Stockholders' Agreement is a contract entered into

between Soundco and Anchel, and its language, therefore, must be construed according to the rules of contract interpretation. *See e.g. Banks Eng'g Co., Inc. v. Polons,* 561 Pa. 638, 752 A.2d 883, 886 (2000) ("[C]ourts should follow the rules of contract interpretation generally applicable when parties to a contract disagree as to the meaning of its terms.").

■ ¶ 17 In contract interpretation, "[d]etermining the intention of the parties is a paramount consideration." *Hutchison v. Sunbeam Coal Corp.,* 513 Pa. 192, 519 A.2d 385, 389 (1986). To discern the parties' intent, the court must give effect to clear and unambiguous terms "without reference to matters outside the contract." *Purdy v. Purdy,* 715 A.2d 473, 475 (Pa.Super.1998). A contract term or provision is ambiguous only when it is "reasonably susceptible to more than one meaning." *West Conshohocken Restaurant Assocs. v. Flanigan,* 737 A.2d 1245, 1248 (Pa.Super.1999). When the words of a contract are clear, "[t]his court will not rewrite the terms of a contract, nor give them a meaning that conflicts with that of the language used." *Glen–Gery Corp. v. Warfel Constr. Co.,* 734 A.2d 926, 929 (Pa.Super.1999); *Martin v. Donahue,* 698 A.2d 614, 616 (Pa.Super.1997). Moreover, "we will not imply a contract different than that which the parties have expressly adopted." *Cambria–Stoltz Enters. v. TNT Invs.,* 747 A.2d 947, 950 (Pa.Super.2000) (quotation marks and citations omitted). "This rule is particularly apt when reviewing a contract involving two parties of relatively equal bargaining power...." *Id.* (citations omitted).

¶ 18 With these rules in mind, we now turn to the definition of "Significant Transaction" as found in the Stockholders' Agreement and other corporate governance documents. A "Significant Transaction" is defined in pertinent part as:

> (E) any transaction (other than transactions involving, the day to day sale of merchandise not involving a long-term contract) with a value of $500,000 or more that relates to the operations of

the Company or any Affiliates, including ... new contract obligations, contract renewal arrangements, employment contracts ...;

* * * *

(I) (i) an extension of any Employment Agreement on its then current terms for a period of time greater than three years beyond its scheduled termination date or (ii) any amendment or modification of, or increase in Base Salary (as defined in such Employment Agreement) under, any such Employment Agreement; ....

Stockholders' Agreement, 5/16/94, at 4–5, Reproduced Record (R.R.) 47a–48a. *See also* Restated By–Laws of Sparkomatic Corporation ("By–Laws"), 5/94, at 4, R.R. 33a (citing substantially same definition of "Significant Transaction"); Articles of Amendment ("Articles"), 5/18/94, at 19–20, R.R. at 23a–24a (citing substantially same definition of "Significant Transaction").

¶ 19 "Significant Transactions" necessitate heightened notice and voting requirements. All directors must have five days' advance notice of the meeting at which a "Significant Transaction" is to be proposed. Stockholders' Agreement, 5/16/94, at 8, R.R. at 51a. *See also* By–Laws at 6, R.R. at 35a; Articles at 20, R.R. at 24a. In contrast, special meetings of the board that do not involve "Significant Transactions" require only two days' prior notice. By–Laws at 4, R.R. at 33a.

¶ 20 Approval of a "Significant Transaction" also requires a super-majority vote of 66 2/3% of the board (i.e. five members of the seven-member board). Stockholders' Agreement at 8, R.R. at 51a. *See also* By–Laws at 6, R.R. at 35a; Articles at 20, R.R. at 24a. In contrast, other board actions that are not "Significant Transactions" require "the affirmative vote of the majority of directors present at a duly convened meeting of the Board at which a quorum is present or, in lieu of a meeting, by the unanimous written consent of the [board] members." *See e.g.* Articles at 20, R.R. at 24a.

¶ 21 We conclude that the record contains no apparently reasonable grounds to support the trial court's determination that Anchel's removal on October 26 th constituted a "Significant Transaction." The record supports the trial court's initial finding that the April 27 th board meeting effectuated the renewal of Anchel's employment contract for "three years, with an increase in base salary, and *with a provision that Anchel may be removed as CEO by a majority vote of the board of directors.*" Preliminary Findings and Conclusions, 12/13/99, at 8 (emphasis added). However, we disagree with the trial court's analysis of the action taken at the October 26 th board meeting that effectuated Anchel's removal by a simple majority vote. The trial court stated:

As evidenced by the current factual dispute as to a change in voting requirements, the removal of Anchel as CEO shall be considered a "Significant Transaction."

*Id.* Initially, we conclude that the existence of a "current factual dispute" is not included in any of the corporate governance documents as a basis for defining a "Significant Transaction."

¶ 22 The trial court expounded on its initial findings and conclusions in its subsequent Rule 1925 Opinion, *see* Pa.R.A.P. 1925(a), in which it concluded that the changes to Anchel's employment contract at the April 27 th meeting were "Significant Transactions"—a finding not specifically made in the trial court's Preliminary Findings and Conclusions on December 13 th. The trial court opined that the changes to Anchel's employment contract comported with the definition of "Significant Transaction" as "any amendment or modification of, or increase in Base Salary (as defined in such Employment Agreement) under, any such Employment Agreement." Trial Court Opinion, 2/18/00, at 3 (citing Stockholders' Agreement, 5/16/94, at 4–5; R.R. at 47a–48a).

¶ 23 Despite the trial court's additional reasoning in its Rule 1925 Opinion, the issue of whether the action taken at the April 27 [th] meeting constituted a "Significant Transaction" is not before our Court. "Our scope of review is limited to determining whether the record reflects any apparently reasonable grounds for the *trial court's action.*" *Norristown Mun. Waste Auth. v. West Norriton Twp. Mun. Auth.*, 705 A.2d 509, 511 (Pa.Cmwlth.1998) (emphasis added). *See Boyle by Boyle v. Pennsylvania Interscholastic Ath. Ass'n*, 676 A.2d 695, 699 (Pa.Cmwlth.1996). The December 13 [th] order reflects no finding or conclusion regarding whether the April 27 [th] meeting constituted a "Significant Transaction." The order states only that the action taken on October 26 [th], i.e. to effectuate Anchel's removal as CEO and President by a simple majority vote of the board, was the "Significant Transaction."

¶ 24 Moreover, in his complaint filed on October 26, 1999, and in subsequent amended complaints, Anchel did not raise the issue of whether the board action taken on April 27 [th] was a "Significant Transaction." Anchel contested only the board action taken on October 26 [th] as a "Significant Transaction" based on the definition of "Significant Transaction" as a "transaction ... with a value of $500,000 or more that relates to the operations of the Company."

¶ 25 With the focus of our review on the specific conclusion contained in the December 13 [th] order (i.e. that the "Significant Transaction" occurred on October 26 [th]), we cannot agree that Anchel's removal was a "Significant Transaction." The simple majority vote to remove Anchel is not a board action included in any of the definitions of "Significant Transaction."

■ ¶ 26 Anchel argues that the record contains alternate bases that would permit our Court to affirm the trial court's finding that Anchel's *removal* on October 26 [th] was a "Significant Transaction." Brief for Edward Anchel, et al., Appellees and Cross Appellants ("Brief for Anchel") at 24 (cit-ing *In re Estate of Dilbon*, 456 Pa.Super. 490, 690 A.2d 1216, 1219 n. 4 (1997) (stating that appellate court may affirm correct decision of trial court on any legal basis)). Anchel relies on the following definition of "Significant Transaction:" "any transaction ... with a value of $500,000 or more that relates to the operations of the Company or any Affiliates, including without limitation ... employment contracts...." *See e.g.* Stockholders' Agreement, 5/16/94, at 4–5, R.R. 47a–48a. Anchel argues that his removal as CEO would result in a massive adverse effect on Altec that would easily exceed $500,000. Brief for Anchel at 25–27. Anchel states, for example, that if any uncertainty is introduced into Altec's customer relationships, Altec could be at risk to lose millions of dollars worth of business. He further argues that his removal as CEO would impact the value of his own equity in the corporation, which approximates $25 million. *Id.* at 27–28. These are tangential and speculative arguments that would, if accepted, infinitely broaden the meaning of "Significant Transaction" as that term is defined in the corporate governance documents thereby defeating the effect of those provisions. Moreover, Anchel's removal was also not a "Significant Transaction" pursuant to the definition of "any transaction ... with a value of $500,000 or more ...." because, although his salary as CEO upon removal was $525,000, he retained this salary in his capacity as Chairman. R.R. at 307a. As we have stated, a preliminary injunction is an extraordinary, interim remedy that should not be issued unless the moving party's right to relief is clear and the wrong to be remedied is manifest. *See Cappiello*, 672 A.2d at 1376; *Vulcanized Rubber & Plastics Co. v. Scheckter*, 162 A.2d at 404. Anchel failed to demonstrate a clear right to relief in his complaint to the trial court requesting a preliminary injunction.

¶ 27 In conclusion on this issue, there is no support in the record that supports the trial court's conclusion that Anchel's removal by simple majority vote on October

26th was a "Significant Transaction." Accordingly, we reverse that portion of the preliminary injunction that ordered Anchel "reinstated as President and CEO effective retroactively to October 26, 1999 immediately prior to the purported removal." Preliminary Findings and Conclusions, 12/13/99, at 9.

¶ 28 In their second issue on appeal, the Soundco group argues that the trial court entered an overbroad preliminary injunction by precluding the board from considering Anchel's removal as president and CEO and imposing a supermajority voting requirement (i.e. 5/7) on *all* actions of the board. Brief for Appellant at 18, 21; Preliminary Findings and Conclusions, 12/13/99, at 12. They further assert that neither party requested such relief. *Id.* at 22. The Soundco group concludes that the trial court's overbroad preliminary injunction does not return the "status quo" as it existed prior to the allegedly wrongful conduct on October 26th, but rather creates a reality that never existed among Altec's directors and shareholders, thereby immobilizing the board and giving Anchel protections far beyond those enumerated in any of the corporate governance documents. Reply Brief for Appellant at 11–12. We agree.

¶ 29 An equity court has broad discretion in "shaping its decree and granting relief tailored to the particular circumstances of the case" pursuant to a party's prayer for general relief. *Lower Frederick Twp. v. Clemmer*, 518 Pa. 313, 543 A.2d 502, 512 (1988); *Sack v. Feinman*, 489 Pa. 152, 413 A.2d 1059, 1063 (1980). Nevertheless, it is also well-settled that "[t]he purpose of a preliminary injunction is to preserve the status quo as it exists or existed before the acts complained of, and the injunction should not go beyond preserving the status quo." *Three County Servs. v. Philadelphia Inquirer*, 337 Pa.Super. 241, 486 A.2d 997, 999 (1985). *See also Karpieniak v. Lowe*, 747 A.2d 928, 931 (Pa.Super.2000) (recognizing that equity court may grant broader relief than that requested, but such relief must be "consistent with and agreeable to the case pleaded and proven").

¶ 30 The trial court explained that it sought to prevent a continuing "injustice" and sought to return control to Anchel—the majority shareholder who lost the control and support of a majority of the board, including his own appointed designee, Freadman. T.C.O., 1/10/00, at 3. The trial court further explained that, where Anchel was precluded by preliminary injunction from reconstituting the board (i.e. the trial court nullified Anchel's action on November 15, 1999, in which he sought to remove Freadman as a director and appoint his son), it was appropriate for the court to "temper the disproportionate voting control apparently held by the minority." *Id.*

¶ 31 We conclude that the trial court's preliminary injunction precluding the board from considering Anchel's removal as president and CEO and imposing a supermajority voting requirement (i.e. 5/7) on *all* actions of the board is overbroad. The court's order and underlying reasoning chafe with the principle that an equity court may not go beyond preserving the status quo. By imposing a supermajority voting requirement on all board actions, the court imposed a "status quo" that never existed. The relevant corporate governance documents imposed a supermajority voting requirement and heightened notice requirement only on "Significant Transactions," not on *all* board actions. Proposals that are not "Significant Transactions" are governed by 15 Pa.C.S. § 1727 of our Business Corporation Law of 1988, which provides that "acts of a majority of the directors present and voting at a meeting at which a quorum is present shall be the acts of the board of directors." Imposing a supermajority voting requirement on all board actions was clearly erroneous. Prohibiting the board from considering Anchel's removal was likewise erroneous. As such, we reverse that portion of the preliminary injunction that precludes the

board from considering Anchel's removal as president and CEO and imposing 'a supermajority voting requirement (i.e. 5/7) on *all* actions of the board.

¶ 32 In their third issue, the Soundco group claims that "the trial court erred in concluding that Tommyca Freadman's voting as a director to rescind the Voting Trust Agreement was inconsistent with his alleged agreement with Mr. Anchel." Brief for Appellant at 23. At the October 26th meeting, the majority of the board, including Freadman, voted to rescind the Voting Trust Agreement.

¶ 33 The Voting Trust Agreement created a trust into which all of Altec's common shares were placed and over which Anchel was named trustee. Sparkomatic Corporation Voting Trust Agreement, 5/17/94, at 2–3; R.R. at 72a–73a. As trustee, Anchel had the "voting rights and powers in respect of all shares of common stock" deposited in the trust. *Id.* at 10–11; R.R. at 80a–81a. The Stockholders' Agreement provides that Anchel shall have the right to "vote and otherwise act with respect to all Common Stock held by the Individual Stockholders." Stockholders Agreement, 5/16/94, at 12; R.R. at 55a. As evidenced by a letter dated May 17, 1994, Freadman agreed to deposit his stock into the voting trust, thereby giving Anchel the sole right to vote Freadman's stock, *so long as Anchel remained as CEO.* Letter from Anchel to Freadman, 5/17/94, ¶ 2.

¶ 34 Pursuant to its order reinstating Anchel as CEO, the trial court further concluded:

> Because Edward Anchel remains CEO, Tommyca Freadman's either voting to rescind the voting trust agreement or giving of his proxy to another party, are in contravention of his agreement with Edward Anchel.

Preliminary Findings and Conclusions, 12/13/99, at 11. Because of our conclusion that the trial court erred in deeming Anchel's removal a "Significant Transaction," we reversed that portion of the prelimi-

nary injunction that reinstated Anchel as CEO, *see supra.* Accordingly, the provisions of Freadman's employment agreement giving Anchel sole power to vote his stock so long as Anchel was CEO are inconsequential.

¶ 35 Nonetheless, we are compelled to conclude that the trial court erred in concluding that Freadman's actions as a director at the October 26, 1999 meeting were "in contravention of his agreement with Edward Anchel." Preliminary Findings and Conclusions, 12/13/99, at 11. Freadman's duties as a director and his role as a stockholder were and are readily distinguishable. In voting to rescind the Voting Trust Agreement, Freadman was acting in his capacity as a director and not in his capacity as a shareholder. The Voting Trust restricts Freadman in his role as shareholder, not in his role as director. The Voting Trust places no obligation on Freadman as a director to vote with or support Anchel. Furthermore, the Voting Trust Agreement expressly provides that it may be terminated by a majority vote of the board of directors, of which Freadman was a member. R.R. 83a–84a, 91a.

¶ 36 Thus, notwithstanding the Voting Trust Agreement, Freadman's duty as director is clear. Pennsylvania's Business Corporations Law defines the relationship of a director to the corporation for which he serves as fiduciary in nature. *See* 15 Pa.C.S. § 1712(a). Section 1712(a) provides, in pertinent part:

**§ 1712. Standard of care and justifiable reliance**

(a) **Directors.**—A director of a business corporation shall stand in a fiduciary relation to the corporation and shall perform his duties as a director, including his duties as a member of any committee of the board upon which he may serve, in good faith, in a manner he reasonably believes to be in the best interests of the corporation and with such care, including reasonable inquiry, skill and dili-

gence, as a person of ordinary prudence would use under similar circumstances. 15 Pa.C.S. § 1712(a).

¶ 37 Our law prescribes that a fiduciary obligation includes both a duty of care and a duty of loyalty. *In re Main, Inc.,* 239 B.R. 281, 291 (Bankr.E.D.Pa.1999).

> The duty of care obligates every corporate director to discharge duties to the corporation with the same diligence, care, and skill which ordinary prudent persons exercise in their personal affairs;

> \* \* \* \*

> The duty of loyalty, on the other hand, requires that corporate directors devote themselves to corporate affairs with a view to promote the common interests and not only their own, and they cannot directly or indirectly utilize their position to obtain any personal profit or advantage other than that enjoyed by their fellow shareholders.

*Id. See also Gruenwald v. Advanced Computer Applications, Inc.,* 730 A.2d 1004, 1013 (Pa.Super.1999) (recognizing that director "owe[s] a fiduciary duty to the corporation to perform in a manner he reasonably believes to be in the best interests of the corporation[.]"). We conclude that because Freadman was bound to Altec by a fiduciary obligation as a corporate director, he was required to exercise both a duty of care and a duty of loyalty for the benefit of Altec and its shareholders. Because a director is bound to "devote [himself] to corporate affairs with a view to promote the common interests and not only [his] own," the Voting Trust Agreement cannot operate to restrict or obviate Freadman's duty as a director. As a director, Freadman must exercise his independent judgment to advance the best interests of the corporation. *See* 15 Pa.C.S. § 1712. Thus, Freadman's commitment as a director vested him, unquestionably, with the right to vote against Anchel. Consequently, the trial court erred in concluding

that "Freadman's either voting to rescind the voting trust agreement or giving of his proxy to another party, are in contravention of his agreement with Edward Anchel." Preliminary Findings and Conclusions, 12/13/99, at 11.

¶ 38 In conclusion, on the Soundco group's issues on appeal, we reverse the preliminary injunction of the trial court insofar as it reinstated Anchel as CEO and President, precluded the board from considering Anchel's removal, imposed a supermajority voting requirement on all board actions, and precluded Freadman from voting to dissolve the Voting Trust Agreement.

¶ 39 We turn now to Anchel's arguments on appeal. Anchel contests the trial court's factual finding that his employment agreement was amended, and Anchel contests the trial court's nullification of the actions taken at the board meeting Anchel called on November 15th.

¶ 40 First, Anchel argues that the trial court erred in its factual finding that his employment agreement was amended on April 27, 1999, to require only a majority vote for termination. Brief for Anchel at 2; Reply Brief for Edward Anchel, et al., Appellees and Cross Appellants ("Reply Brief for Anchel") at 13. The trial court made the following factual finding in conjunction with its order nullifying the board's action to remove Anchel on October 26th:

> At the April 27, 1999 meeting of the Board of Directors, Edward Anchel's contract as president and CEO was renewed for a period of three years, with an increase in base salary, and with a provision that Anchel may be removed as CEO by a majority vote of the Board of Directors.

Preliminary Findings and Conclusions, 12/13/99, at 8. Anchel argues that there is no documentation to support the trial court's finding that his contract was amended to include the provision for a simple majority vote of the board to effectuate Anchel's removal. Brief for Anchel

at 37. Anchel further argues that, because of this lack of documentation, the court should have concluded that his employment contract was renewed, not amended, as per the testimony of Anchel, Dion, and Parente. *Id.* Anchel opines, "[i]f all the Board did was renew the employment agreement, there was no need to draw up a new document. With renewal, all provisions of the existing contract stay in place, with the exception of the term, which was extended for three years." *Id.* Anchel also states that it is "inconceivable that [he] would agree to an amendment to his employment agreement that makes it easier for the Soundco Group to remove him as CEO and President of Altec." *Id.* at 38. Anchel concludes that the court's finding is unsupported by the evidence. Reply Brief for Anchel at 13. In its essence, Anchel's argument is that the trial court erred in its factual determination that the board carried a motion on April 27th that would allow for Anchel's removal by a simple majority vote.

■■■ ¶ 41 "When reviewing the decision of an equity court, the chancellor's findings of fact will stand unless there has been an abuse of discretion, a capricious disbelief of the evidence, or a lack of evidentiary support on the record for the findings or there has been an error of law." *Hahalyak v. A. Frost, Inc.*, 444 Pa.Super. 494, 664 A.2d 545, 548 (1995). It is the fact-finder's duty to judge the credibility of the witnesses and weigh their testimony. *See Weir by Gasper v. Estate of Ciao*, 521 Pa. 491, 556 A.2d 819, 824 (1989).

■■ ¶ 42 In its Rule 1925 Opinion, the trial court explained that it found "the witnesses who testified to the existence of the simple majority removal term to be more credible." T.C.O., 2/18/00, at 4. Particularly, the trial court determined that McCartney was a credible witness. *Id.* McCartney testified that the board passed a resolution on April 27th to allow for Anchel's removal by a simple majority vote. N.T., 11/22/99, at 161; R.R. at 315a.

McCartney further testified that he spoke with Anchel on that same day, and Anchel purportedly supported the proposals of April 27th. *Id.* at 162; R.R. at 315a. This is ample evidence to support the trial court's finding that the provision to allow for Anchel's removal by simple majority vote was passed by board resolution on April 27th.

■■ ¶ 43 Next, Anchel asserts that the trial court "erred in declaring Anchel's actions to replace Freadman after the October 26, 1999 meeting invalid." Brief for Anchel at 43. After the October 26th ouster of Anchel, Anchel sent letters addressed to the "President" and "Secretary" of Altec, dated October 29, 1999, requesting that notice be sent to all shareholders of a special shareholders' meeting to be held on November 12, 1999. R.R. at 135a, 136a. The notice stated the purposes of the meeting, including the removal of Freadman from the board to be replaced with David Anchel. *Id.* Anchel testified that, due to the failure of the President or Secretary to send the requested notice, Anchel sent the notice himself. R.R. at 300a. On November 12, 1999, Anchel attempted to hold the special shareholders' meeting, but adjourned it for lack of a quorum pursuant to 15 Pa.C.S. § 1702(b). Brief for Anchel at 14. Anchel sent notice to all shareholders, dated November 12th, of the re-convening of the meeting to be held on November 15, 1999. R.R. at 142a. Significantly, 15 Pa.C.S. § 1756(b)(1) provides that "those shareholders entitled to vote who attend a meeting of shareholders … [a]t which directors are to be elected that has been previously adjourned for lack of a quorum, although less than a quorum as fixed in this section or in the bylaws, shall nevertheless constitute a quorum for the purpose of electing directors."

¶ 44 Anchel claims that the Soundco representatives received notice of the November 15th shareholder and board meetings, but failed to attend either meeting. Brief for Anchel at 14. Pursuant to section 1756(b)(1), Anchel proceeded with the No-

vember 15 th shareholder meeting. At that meeting, Anchel and his loyal compatriots voted to remove Freadman as a director and replace him with David Anchel—Anchel's son. Later that day, at the board meeting, the four directors, Anchel, David Anchel, Parente, and Dion—voted to rescind all the actions taken by the Soundco group at the October 26 th meeting.

¶ 45 The trial court concluded that the November 15 th meeting was not properly convened because Shea, a shareholder loyal to Soundco who was present on the premises, was excluded from the shareholder's meeting. Preliminary Findings and Conclusions, 12/13/99, at 9–10; N.T. Hearing, 11/22/99, at 220–21. The trial court also recognized the provision in Freadman's employment agreement of May 17, 1994, which indicates, "[s]o long as [Freadman] is employed by [Altec], he will be a director." R.R. at 91a. Accordingly, the trial court ordered "that the actions taken at the Shareholders and the Directors Meetings of November 15, 1999, shall be considered null and void, and the board shall be comprised as it was on November 11, 1999." Preliminary Findings and Conclusions, 12/13/99, at 10, 12.

¶ 46 Anchel argues that because of Freadman's disloyalty to Anchel, Anchel should be permitted to remove Freadman as his designee to the board. Brief for Anchel at 43. Anchel relies on those provisions of the Stockholders' Agreement that require each party to support the other party's appointment or removal of its designees to the board of directors. The pertinent provisions include the following:

SECTION 2.01. *Composition of the Board of Directors.* (a) General. The Board shall initially consist of five directors, of which (i) Soundco shall have the right to designate two individuals to serve as directors and (ii) ... Anchel shall have the right to designate three individuals to serve as directors ....

* * * *

(e) *Election of Directors.* Each Stockholder Party hereby agrees to vote all shares of Voting Securities owned by such Stockholder Party to cause the election to the Board of Directors of the individuals designated by the Stockholder Parties in accordance with this Section 2.01.

SECTION 2.02. *Removal of Directors.* Each Stockholder Party shall vote all shares of Voting Securities owned by such Stockholder Party for the removal (with or without cause) of any director designated and elected pursuant to Section 2.01 hereof if the Stockholder Party entitled to designate such director pursuant to Section 2.01 requests such removal by written notice to the other Stockholder Parties.

Stockholders' Agreement, 5/16/94, at 6–7; R.R. at 50a–51a. Anchel argues that, even if any Soundco group representative was improperly excluded from the November 15 th meetings, such exclusion is "harmless error." Anchel argues that under the foregoing provisions of the Stockholder's Agreement, the Soundco representatives are bound to vote for Anchel's new designee, David Anchel, and are bound to vote with Anchel to remove Anchel's former designee, Freadman. Nevertheless, the trial court emphasized that Freadman's employment agreement prohibits his removal from the board, so long as Freadman is an Altec employee. The trial court further reasoned:

For Anchel to choose a new designee for the board, and to remove Freadman from the board would require the participation of Soundco's agent (Shea) at the meeting to either reassign Freadman as either an independent director or as Soundco's designee. By intentionally excluding others from the meeting (while they were waiting for the meeting across the hall), Anchel prevented compliance with the shareholder agreement which required Freadman to be retained as a director. Using the logic that he

has the unfettered power as a shareholder to choose designees as a reason to justify excluding others from the meeting, does not overcome the fact that his concurrent duties as a shareholder (i.e. maintaining Freadman as a director) may require the participation of others at the meeting. This was not a case where the others refused to participate. T.C.O., 2/17/00, at 5. We agree with and adopt this reasoning of the trial court, as the record supports it. As previously noted, we will affirm the granting of a preliminary injunction on any apparently reasonable grounds contained in the record. *See Palladinetti*, 695 A.2d at 863 n. 11.

¶ 47 In conclusion, we reverse those portions of the preliminary injunction entered on December 13, 1999, which (1) reinstated Anchel as President and CEO; (2) precluded the board from considering the removal of Anchel as CEO and President; and (3) required all action of the board to be valid only if approved by at least a 5/7ths vote of the entire board. We affirm that portion of the preliminary injunction entered on December 13, 1999, which nullified and voided the actions taken at the Shareholders' and the Directors' Meetings of November 15, 1999.

¶ 48 Order **AFFIRMED IN PART** and **REVERSED IN PART**.