**DUQUESNE LIGHT COMPANY,**
**Appellee**

v.

**LONGUE VUE CLUB, Appellant.**

Superior Court of Pennsylvania.

Argued Oct. 2, 2012.

Filed Jan. 15, 2013.

Kenneth J. Yarsky, II, Pittsburgh, for appellant.

Russell J. Ober, Jr., Pittsburgh, for appellee.

BEFORE: BENDER, DONOHUE, and STRASSBURGER,* JJ.

OPINION BY STRASSBURGER, J.:

Longue Vue Club (Longue Vue), Appellant, appeals from the June 13, 2012, order granting a preliminary injunction[1] on behalf of Appellee Duquesne Light Company (Duquesne Light). We affirm.

The trial court has ably summarized the relevant factual and procedural history of this case.

> On September 20, 1920, by a deed issued from Mutual Life Insurance Company of New York, Longue Vue took title of a piece of real property (hereinafter "Parcel 1") in Penn Township, which is now known as Penn Hills Township. The deed was recorded in the office of the Allegheny County Recorder of Deeds at Deed Book Volume 2105, page 161. On December 2, 1949, by a deed issued from Fidelity Trust Company, et al., Executors, Longue Vue took title to an adjacent piece of real property (hereinafter "Parcel 2") in Penn Hills Township. The deed was recorded in the office of Allegheny County Recorder of Deeds at Deed Book Volume 3075, page 383. These pieces of land (hereinafter collectively "Longue Vue property") are now home to the Longue Vue Club, [a] historic club offering a golf course, a clubhouse, outdoor space, and various other amenities and leisure activities. The Club enjoys prized views of the Allegheny River from its club-

house (the "Pink Terrace"), golf course, and shooting range.

On September 19, 1949, Longue Vue granted Duquesne Light an easement over and across Parcel 1 via an Indenture recorded in the office of the Allegheny County Recorder of Deeds at Deed Book Volume 3055, Page 622. In relevant part, the Easement Agreement with regards to Parcel 1 provides:

> ... a perpetual easement and right of way fifty (50) feet in width, with the additional right to erect and maintain the necessary anchors and appurtenances in connection therewith outside the limits of said right of way, upon, over, under and across that certain tract of land situate in the Township of Penn, Allegheny County, Pennsylvania, which the Mutual Life Insurance Company of New York by its deed dated September 20, 1920, and of record in the Recorder's Office of Allegheny County, Pa., in Deed Book Vol. 2105, page 161, granted and conveyed unto Longuevue [sic], party of the first part hereto;

> for a transmission system for the conveyance, distribution and use of electric current, consisting of wires, cables and crossarms, supported on poles, H-frames, steel towers or columns, and anchors, guys and other fixtures and apparatus which [Duquesne Light], its successors or assigns, may deem necessary or proper for use in connection with said transmission system, with the right, privilege and authority to erect, construct, use operate, maintain, repair, renew and finally remove the same, and to enter upon said tract of land at any time for said purposes, together with the further right to trim

---

* Retired Senior Judge assigned to the Superior Court.

1. Such orders are immediately appealable as of right. Pa.R.A.P. 311(a)(4).

or remove any trees, shrubbery or obstructions which at any time [Duquesne Light], its successor or assigns, may deem necessary to prevent interference or threatened interference with the construction, maintenance, repair, renewal, use or operation of said transmission system, and with the further additional right to install and maintain electric conductors underneath the surface of the ground in the vicinity of said poles, "H" frames, steel towers or columns, for the purpose of providing grounding protection for said electric transmission system, if now or at some future time [Duquesne Light], its successors or assigns, desire so to do. The said Duquesne Light Company, its successors and assigns, shall have the right at any time to replace one kind of construction with another, and the erection of one kind of support shall not preclude the erection of another.

\*   \*   \*

On October 24, 1949, prior to the deeding of Parcel 2 to Longue Vue, Fidelity Trust Company granted Duquesne Light an easement over and across Parcel 2 via an Indenture recorded in the office of the Allegheny County Recorder of Deeds at Deed Book Volume 3072, Page 64. In relevant part, the Easement Agreement with [regard] to Parcel 2 provides:

. . . a perpetual easement and right of way fifty (50) feet in width upon, over, and across that certain tract of land situate in Penn Township, Allegheny County, Pennsylvania, which Isabel Wallace et al. by their deed dated June 17, 1926, and of record in the Recorder's Office of Allegheny County, Pennsylvania, in Deed Book Vol. 2277, page 566, granted and conveyed unto Edmund W. Mudge; for a transmission system for the conveyance, distribution and use of electric current, consisting of cables and wires and other fixtures and apparatus which the said Grantee may deem necessary or proper for use in connection with said transmission system, with the right, privilege and authority to erect, construct, use, operate, maintain, repair, renew and finally remove the same, and to enter upon said tract of land at any time for said purposes, together with the further right to trim or remove any trees, shrubs or obstructions which at any time the said Grantee may deem necessary to prevent interference or threatened interference with the construction, maintenance, repair, renewal, use or operation of said transmission system.

The said easement and right of way across the land hereinbefore described shall extend across the westerly end of said land from land now or formerly of Longvue Club to land now or formerly of Catherine M. Battaglia. The center line thereof shall be located substantially as shown by the red line on print of Duquesne Light Company drawing No.LL–3832, attached hereto and made a part hereof. No supporting structures shall be erected on said land.

The easements over and across Parcel 1 and Parcel 2 (hereinafter "the Easements"), have been used, since 1949, as a location for a part of a 69kV [kilovolt] electrical transmission line.

In 2009, realizing that an upgrade to the line was necessary to meet electricity demand in the region, as well as to make sure that the electricity being provided was reliable, Duquesne Light began seeking the necessary Pennsylvania Public Utility Commission (hereinafter

"PUC") approvals in order to upgrade the 69kV line to a 345kV line. During the PUC approval process, numerous notices were sent to Longue Vue, inviting the club, as the holder of affected property, to participate in the process, attend a hearing, and voice any concerns it might have. Longue Vue did not participate in the PUC approval process, which was completed when the upgrade was approved by PUC on February 10, 2011.

Duquesne Light determined that it would be necessary to construct temporary access roads to reach the Easements and complete the upgrade project. Duquesne Light also determined that it would need to perform core boring and drilling tests in the Easements prior to beginning the upgrade, and informed Longue Vue of the commencement of its preliminary work in December of 2010. However, when Duquesne Light's contractors began constructing a temporary access road on December 9, 2010, the contractors were asked to leave by Longue Vue employees. On December 27, 2010, Longue Vue notified Duquesne Light that Longue Vue believed that Duquesne Light did not have the right to access any portion of the Longue Vue property outside of that expressly granted by the Easement Agreements.

Longue Vue and Duquesne Light held a number of meetings in early 2011, affording both parties the opportunity to express concerns about the upgrade project. At these meetings, Longue Vue expressed concerns about the taller (approximately 150 feet) poles being installed, and the impact that poles would have on Longue Vue's historic view. Additionally, the parties explored and discussed alternative construction methods and equipment that could potentially be used for the completion of the project.

Between May of 2011 and February of 2012, the parties continued to meet to try to resolve their differences and discuss alternatives. On February 28, 2012, Duquesne Light's Vice President of Operations informed Longue Vue's President that Duquesne Light had determined that the original design for the portion of the 345kV line located within the Easements was the best option. On March 16, 2012, Duquesne Light's President and CEO informed Longue Vue that contractors would begin to work on the upgrade project on March 23, 2012. Complaint ¶ 22. However, when the contractors arrived on March 23, 2012, representatives of Longue Vue denied them access to the property.

\*       \*       \*

On March 27, 2012, [Duquesne Light] filed a [complaint for declaratory judgment and a] Motion for Preliminary Injunction against [Longue Vue] pursuant to Easement Agreements signed by [Longue Vue] in 1949.... Duquesne Light [requested] a preliminary injunction against Longue Vue preventing Longue Vue from interfering in any way with Duquesne Light's use of the Easements in any manner that is reasonable and necessary for the conveyance, distribution and use of electric current. Duquesne Light also [sought] to prevent Longue Vue from taking any action that would interfere with or impede Duquesne Light from constructing access roads across the Longue Vue property, operating the skeet shooting range on the Longue Vue property during construction work on the Easements, and taking any action that would interfere with or impede Duquesne Light from entering upon the Longue Vue property for any purpose relating to the electrical transmission system.

The taking of testimony and the introduction of documentary evidence occurred during multiple days of hearing on Duquesne Light's Motion for Preliminary Injunction before [the trial court].

[On June 13, 2012, u]pon consideration of the testimony and evidence offered by the parties at the hearing, [the trial court] entered an Order granting Duquesne Light's request for a preliminary injunction, as it found that Duquesne Light had proven each of the six prerequisites necessary for the issuance of a preliminary injunction.

Trial Court Opinion, 7/13/2012, at 4–9, 1–2 (citations omitted). This timely appeal followed.

On appeal, Longue Vue asks us to consider whether the trial court abused its discretion in granting Duquesne Light's motion for preliminary injunction. Longue Vue's Brief at 4. Specifically, Longue Vue argues that Duquesne Light failed to prove (1) that it would be irreparably harmed if the injunction were not granted, (2) that the injunction would maintain the *status quo* between the parties, and (3) that it was likely to prevail on either its claim that the Easement Agreements included right-of-way access to its property, or its claim that the Easement Agreements did not limit the height or type of pole it may erect on the easements. *Id.*

■ Appellate courts review the grant of a preliminary injunction for an abuse of discretion. *Ambrogi v. Reber*, 932 A.2d 969, 974 (Pa.Super.2007) (internal citations omitted).

■ As our Supreme Court has emphasized:

The standard of review applicable to preliminary injunction matters ... is "highly deferential". This "highly defer-ential" standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to "examine the record to determine if there were any apparently reasonable grounds for the action of the court below."

*Id.* at 46 (citation omitted).

A petitioner seeking a preliminary injunction must establish every one of the following prerequisites; if the petitioner fails to establish any one of them, there is no need to address the others.

First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity. Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

*Kessler v. Broder*, 851 A.2d 944, 947

(Pa.Super.2004).[2]

As to the first criterion, Longue Vue claims that Duquesne Light "cannot establish that failure to grant the preliminary injunction will cause it irreparable harm" because any urgency associated with upgrading the transmission system is purely speculative and the upgrade itself is premised upon "contingencies that may or may not occur." Longue Vue's Brief at 20.

The trial court disagreed, noting the following.

> Here, Duquesne Light has clearly demonstrated an imminent threat of irreparable harm which cannot adequately be compensated in money damages. Through testimony and evidence, Duquesne Light has demonstrated that Longue Vue, by preventing Duquesne Light from upgrading its electric transmission system, is creating a substantial risk that the electric system will overload, and that Duquesne Light customers will lose power.

Trial Court Opinion, 7/13/2012, at 10.

We agree with the conclusion of the trial court. A review of the record indicates that Longue Vue's assertions mischaracterize the testimony of Meghan Sullivan (Sullivan), Duquesne Light's Manager of Transmission Planning. Sullivan testified that she conducted a reliability assessment of the Highland Logan's Ferry line (HLF line), which was installed in 1927 and upgraded to a 69kV line in the 1950s. N.T., 4/30/2012, at 75. Sullivan determined the HLF line was experiencing low voltage, overloading, and an increased potential for outages. Sullivan further testified that outdated 69kV lines were common in the area, and if the HLF line would overload, the other 69kV lines could not handle the overload and would go down as well. *Id.* at 76. Thus, she concluded that a system-wide upgrade was necessary in order to correct these problems and ensure reliable electricity to Duquesne Light's customers. *Id.* at 75–77. Specifically, Sullivan's analysis recommended, among other improvements, upgrading the existing HLF line to a larger 345kV line. *Id.* Sullivan testified that other alternatives, including an upgrade to a 138kV line had been considered, but it was determined that installing a 345kV line was the only way to solve the problem. *Id.* at 103. The upgraded HLF line would not be a back-up line, but would immediately begin servicing customers upon its installation. *Id.* at 84.

Sullivan testified that she submitted her findings and analysis to the Federal Energy Regulatory Commission and the National Energy Regulatory Commission. Both independently determined that an upgrade was necessary to ensure the reliability of the electrical transmission system. *Id.* at 80.

Sullivan's testimony indicates that there exists a threat to the reliability of the 69kV HLV transmission line, and a high potential of loss of power to Duquesne Light customers, if the line is not upgraded. This threat was realized on July 22, 2011, when, in the heat of summer, "three Duquesne Light generating units went down, various nuclear plants were [derated[3]], and number of other problems oc-

---

**2.** Longue Vue makes no argument with regard to the trial court's assessment that Duquesne Light has met its burden of proving that greater injury would result in refusing an injunction than from granting it, that the injunction is reasonably suited to abate the offending activity or that the injunction would not adversely affect the public interest. *Penn-* *sy Supply, Inc. v. Mumma,* 921 A.2d 1184, 1192 (Pa.Super.2007); Trial Court Opinion, 7/13/2012, at 15–16, 21. Thus, we will not discuss those prerequisites to obtaining a preliminary injunction.

**3.** To "derate" a nuclear power plant means to "reduce the electrical power rating ... to improve safety, reliability or efficiency."

curred creating an emergency situation that bordered on an overload of the system." Trial Court Opinion, 7/13/2012, at 11. According to Sullivan, the contingency analysis of the transmission line run on July 22, 2011 showed that excessively hot summer temperatures would continue to pose a threat to the overworked line, with the possibility that the line would need to be shut off in order to reduce the overload of the system. N.T., 4/30/2012, at 70. Additionally, other 69kV lines have overloaded in the past, taxing the existing system, which is ill-equipped to handle overages. That the entire system has not yet overloaded does not defeat Duquesne Light's claim of immediate and irreparable harm if the upgrade is not permitted to continue. Based on the above, we find that Longue Vue's first argument is without merit.

Longue Vue also disputes "Duquesne Light's claim that it will incur significant costs[4] if construction is delayed." Appellant's Brief at 22 (footnote added). On this point, Longue Vue contends that any economic loss suffered from delay in construction is self-inflicted because Duquesne Light insisted on proceeding with the upgrade despite Longue Vue's opposition. Duquesne Light admits that it has suffered economic harm in proceeding in light of pending litigation, but maintains that "the real irreparable harm to Duquesne Light [is] a lack of system reliability" and it is on that basis that the injunction has been sought. Duquesne Light Brief at 20 n. 5. Based on this assertion, we hold that Duquesne Light has met its burden of proving that an injunction is necessary to prevent immediate and irreparable harm.

■ As to the second criterion, Longue Vue claims that that the preliminary injunction is not necessary to maintain the *status quo* that existed prior to the lawsuit. Longue Vue's Brief at 23. Specifically, Longue Vue contends that the *status quo* that should be maintained is Duquesne Light's ownership of the easement property. Longue Vue argues that the trial court is misinterpreting the *status quo* to include unlimited right-of-way access over various portions of Longue Vue property. *Id.* Longue Vue contends that this access is not included in the Easement Agreements, but was bargained for separately by Duquesne Light over the course of 60 years, and is not part of the *status quo*. *Id.* at 24–25.

It is undisputed that from time to time during the existence of the Easement Agreements, Duquesne Light would access its easements to make repairs or perform maintenance. The testimony established that representatives from Duquesne Light would "sometimes stop in [to the office of Mike Wood (Wood), Longue Vue's golf course superintendent,] to . . . make sure it was ok to come on the property [to access the easement and right-of-way thereto and perform maintenance on such property] because they have to travel through a lot of golf course." N.T., 5/1–2/2012, at 375. Wood testified that "[Longue Vue] always let [Duquesne Light] go [through the golf course], because it made

---

Webster's New World College Dictionary, 4th Ed. (2010).

**4.** James Boyle, Duquesne Light's Senior Project Manager in the construction group, testified during a Supplemental Deposition that foundations were in place for all but three of the 67 poles necessary to complete the HLV line upgrade. Boyle Deposition, 6/4/2012, at

**5.** The three remaining poles are at the center of this dispute. According to Boyle, the cost of delaying work on these poles is approximately $10,000 per day. Additionally, the cost of demobilizing and remobilizing the drilling equipment is an aggregate of $50,000. *Id.* at 14.

[Duquesne Light's] job a whole lot easier[.]" *Id.* at 376.

On appeal, Longue Vue characterizes these requests for permission as "additional easements" granted following a "formal request" from Duquesne Light. Longue Vue's Brief at 24. Longue Vue suggests that Duquesne Light's requests for permission demonstrate that it did not possess the rights to any right-of-way, and that right-of-way access is not included in the *status quo. Id.* We disagree.

■ The purpose of a preliminary injunction is to prevent irreparable injury or gross injustice by preserving the *status quo* **as it exists or as it previously existed before the acts complained of in the complaint.** *Anchel v. Shea,* 762 A.2d 346, 351 (Pa.Super.2000) (emphasis added). In this case, the complained of conduct is Longue Vue's interference with Duquesne Light's access to and construction upon its easements. As the trial court noted, the "[t]estimony of [Wood], supports the fact that, prior to this recent dispute, the *status quo* was that Duquesne Light was able to frequently access its Easements for any purpose, and that Longue Vue did not object to the use of its property to provide such access." Trial Court Opinion, 7/13/2012, at 16. As we discuss in more detail below, the language of the Easement Agreements, and Pennsylvania case law, grant Duquesne Light the right of access to the easement properties. Thus, we agree with the trial court's assessment that the *status quo* that the injunction seeks to preserve includes access to the easements through Longue Vue's property. This is the *status quo* that existed prior to December 9, 2010, when Longue Vue began denying Duquesne Light access to the easements. We thus agree with the trial court that an injunction is necessary to preserve the *status quo.* Accordingly, we conclude that Long Vue's argument on this point is without merit.

■ In its final two arguments, Longue Vue contends that the trial court erred when it determined (1) that Duquesne Light will likely prevail on its claim that the Agreement grants it the right to access the property through "any portion" of Longue Vue's property and (2) that Duquesne Light will likely prevail on its claim that the Agreement does not limit the type and/or height of poles placed on the easements. Longue Vue's Brief at 4.

First, Longue Vue argues that the Easement Agreements grant Duquesne Light the rights to a 50–foot tract of land with no right-of-way access. Longue Vue Brief at 12. The trial court disagreed with Longue Vue's narrow interpretation of the Easement Agreements.

Under Pennsylvania law, easements are interpreted under the same rules of construction as contracts. *See Sigal v. Manufacturers Light and Heat Company* [450 Pa. 228], 299 A.2d 646, 649 (Pa.1973); *Percy A. Brown & Co. v. Raub* [357 Pa. 271], 54 A.2d 35, 43 (Pa. 1947); *Hann v. Saylor* [386 Pa.Super. 248], 562 A.2d 891, 893 (Pa.Super.Ct.1989). In construing an Easement Agreement, the Court is required to first examine the Agreement itself. *Bito Bucks in Potter, Inc. v. National Fuel Gas Supply Corp.* [303 Pa.Super. 208], 449 A.2d 652, 654 (Pa.Super.Ct.1982). If the Agreement contains clear and unambiguous language, the words of the Agreement alone will control its interpretation, and the Court need not look further than the Agreement itself. *McNaughton Properties, LP v. Barr,* 981 A.2d 222, 223 (Pa.Super.Ct.2009).

Both Agreements at issue here grant Duquesne Light "a perpetual easement and right of way fifty (50) feet in width"

upon each parcel of land and state that Duquesne Light has a right "to enter upon said tract of land at any time for said purposes" related to the operation of the electrical transmission system. Additionally, both Agreements explicitly specify that "said tract of land" refers to the entirety of the property recorded.[1] The Easement Agreement with regards to Parcel 1 grants Duquesne Light the express right "at any time to replace one kind of construction with another" and the Easement Agreement with regards to Parcel 2 grants Duquesne Light the right to "renew" its transmission system. Finally, both Agreements state that Duquesne Light may use the land in any way in which it "may deem necessary" for the purposes of an electrical transmission system. This Court finds the language of the Agreements unambiguous in its grant of both the right to access the Easements, and the right to upgrade the electric transmission system on the Easements.

---

1. In construing the language of the Agreement, it is explicitly clear that the Agreements allow Duquesne Light to enter upon the Longue Vue property in order to access its Easements. Note that both agreements distinguish between "tract of land" (used to denote the entire parcel) and "easement and right of way" (used to denote the 50–foot easement granted). The right "to enter upon said tract of land for said purposes" clearly denotes a right to enter the property to access its Easements. Had the drafters intended [only to] grant entry within the 50–foot right of way, they would have granted a right "to enter upon said easement and right of way for said purposes." The drafters failed to do so in either Agreement, choosing instead to grant access to the "tract of land" which is clearly described at the start of each Agreement as the entirety of the parcel recorded.

Additionally, Pennsylvania law has carved out a right of access across servient land to easement-holders with a right to maintain the easement property.

Where an easement agreement provides the holder of the easement with the right to maintain something on the easement, Pennsylvania courts have held that such easement agreements necessarily allow the easement-holder to access the easement, whether or not the language of the easement agreement provides for such access. In *Edgett v. Douglass*, where an easement agreement granted a party "the right to maintain a dam" on the property of another party, the Pennsylvania Supreme Court determined that "[t]he right to maintain the dam means the right to keep up . . . to repair . . . [T]he right to repair necessarily involved the right to go upon the land for that purpose, and must have been so understood by the parties to the reservation at the time it was made." 22 A. 868 (Pa.1891). Similarly, in *Sabara v. Macsai*, where a party was granted a right-of-way of mill race through a farm owned by another party, and the right to "enter at all times on said land along banks of said race for the purpose of maintaining, repairing and cleaning," the Pennsylvania Superior Court determined that "the owner of the right-of-way may go on the lands through which the mill race runs . . . for the purpose of cleaning it and making repairs." [121 Pa.Super. 274], 183 A. 454, 456 (Pa.Super.Ct.1936).

Even if [the trial court] did not find the language in the Easement Agreements unambiguous, in its grant of the right to enter the Longue Vue property in order to access the Easements, Duquesne Light would likely prevail on the argument that the Easement Agreements here imply such a right. Both of the Agreements afford Duquesne Light a right to "maintain, repair, [and] renew" the electric transmission line on the Easements. As such, under Penn-

sylvania law, Duquesne Light would likely have an implied right of access, even were the right "to enter upon said tract of land" not expressly granted.

Finally, under Pennsylvania law, easements may be used for any reasonable and necessary purpose. In determining the scope of an easement created by an express grant (such as the Easements at issue here), the intent of the parties must be advanced, and the easement must be construed in favor of the grantee. In *Hammond v. Hammond,* an easement was granted to a party giving it the right of "free and uninterrupted use, liberty and privilege of a road twenty feet in breadth from the said premises across the creek to the public road. . . ." [258 Pa. 51], 101 A. 855, 856 (Pa.1917). For more than 21 years, the only means of crossing the creek was via a log or the use of a ford. *Id.* The defendant (easement-holder) erected a bridge across the creek, and was sued when the [creek] flooded [and deposited a portion of the bridge] onto the land of the plaintiff (easement-grantor). *Id.* The court concluded that the construction of the bridge was within the right of the defendant, and that, had the grantor wished to limit the grant to the ford, he could have expressly done so in the deed. *Id.See also Dowgiel v. Reid* [359 Pa. 448], 59 A.2d 115, 117 (Pa. 1947[1948] ) (court found constructing electric lines along a private road granted via an easement was reasonable and necessary); *Garan v. Bender* [357 Pa. 487], 55 A.2d 353, 354 (Pa.1948[1947] ) (court found that driving cars on a road previously only used for pedestrian crossing was reasonable and necessary).

Trial Court Opinion, 7/13/2012, at 17–20.

We agree with the trial court's assessment. The language of the Easement Agreements, and prevailing Pennsylvania

precedent, demonstrate that Duquesne Light has a right to access the 50–foot Easement Property. Given the fact that the Easement Property is surrounded by land owned by Longue Vue, Duquesne Light will necessarily require right-of-way access through land owned by Longue Vue. Accordingly, we hold that Longue Vue's argument, that the Easement Agreements do not grant Duquesne Light right-of-way over Longue Vue property, is without merit.

Finally, we turn to Longue Vue's assertion that the Easement Agreements in some way limit the height or type of poles permitted on the property. Once more, we find persuasive the analysis of the learned trial court.

. . . [the trial court] finds that the upgrade is a reasonable use of the Easements based on the clear intent of the parties at the time that the Easements were granted. The language of the Easement with regards to Parcel 1 expressly provides that the purpose of the Easement is "for a transmission system for the conveyance, distribution and use of electric current, consisting of wires, cables and crossarms, supported on poles, H-frames, steel towers or columns, and anchors, guys and other fixtures and apparatus which the said party of the second part, its successors or assigns, may deem necessary or proper for use in connection with said transmission system." While Duquesne Light intends to use monopoles in the place of shorter H-frame poles that were installed in 1949, the use of the monopoles does not seem unreasonable in light of the language of the Agreement allowing for "poles, H-frames, steel towers or columns." Similarly, the installation of monopoles does not seem unreasonable in light of the Easement Agreement with regards to Parcel 2, and its descrip-

tion of the Easement being used for "cables and wires and other fixtures and apparatus which the said Grantee may deem necessary or proper for use in connection with said transmission system." Finally, the installation of monopoles does not seem unreasonable in light of the testimony demonstrating that Duquesne Light considered numerous alternatives to the current project, and determined that each of these alternatives was significantly less desirable for reasons ranging from safety of the land, feasibility, vegetation-clearing and environmental concerns, and property rights. Significantly, Longue Vue did not [participate in the Pennsylvania Utilities Commission proceedings discussing the upgrade, nor did it] present any testimony or expert opinions regarding any feasible alternative not considered by Duquesne Light. It is also important to note that Longue Vue did not refute any of the testimony or evidence demonstrating that the other alternatives were not feasible and that the chosen project was the best option for the upgrade.

Trial Court Opinion, 7/13/2012, at 17–20 (footnote 2 omitted).

Accordingly, for the reasons stated above, we agree with the trial court that Duquesne Light has met its burden of proving its likelihood of success on the merits.

Because the necessary prerequisites to obtain a preliminary injunction have been met, we find no error in the trial court's decision. Accordingly, we affirm the trial court's order.

Order affirmed.

Judge DONOHUE files a Concurring Opinion.

CONCURRING OPINION BY DONOHUE, J.:

I join in the entirety of the Majority's opinion, except with respect to its adoption of the learned trial court's alternative reliance on Pennsylvania case law regarding the rights of access of easement holders across servient lands to support its conclusion that Duquesne Light was likely to prevail on its claims that the easement agreements grant it the right to access the property through any portion of Longue Vue's property and that the agreement does not limit the type and/or height of poles placed on the easements. As noted by the Majority and the trial court, the language of the easement agreements at issue here clearly and unambiguously establish Duquesne Light's right to access the easements and to upgrade the electric transmissions system at its discretion. As a result, no additional or alternative analysis of the scope of the easement is necessary or appropriate. *See, e.g., McNaughton Properties, LP v. Barr,* 981 A.2d 222, 223–25 (Pa.Super.2009) (this Court is "without authority to modify the terms of an unambiguous express easement"). Thus, I concur only in the result as to these issues.