J-A29041-14

**NON-PRECEDENTIAL DECISION – SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| SLT HOLDINGS, LLC, JACK E. MCLAUGHLIN, and ZUREYA A. MCLAUGHLIN, | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellees | : | |
| | : | |
| v. | : | |
| | : | |
| MITCH-WELL ENERGY, INC., and WILLIAM E. MITCHELL, JR., AN INDIVIDUAL, | : | |
| | : | |
| Appellants | : | No. 460 WDA 2014 |

Appeal from the Order Dated February 14, 2014
in the Court of Common Pleas of Warren County
Civil Division at No(s): A.D. 626 of 2013

BEFORE: FORD ELLIOTT, P.J.E., ALLEN, and STRASSBURGER,* JJ.

MEMORANDUM BY STRASSBURGER, J.: **FILED DECEMBER 15, 2014**

Mitch-Well Energy, Inc. (Mitch-Well), and William E. Mitchell, Jr. (Mitchell) (collectively, "Appellants") appeal from the grant of a preliminary injunction against them and in favor of SLT Holdings, LLC, Jack E. McLaughlin, and Zureya A. McLaughlin (Appellees). Upon review, we affirm.

The background of this case can be summarized as follows. This case involves oil, gas, and mineral rights (OGMs) to two separate parcels of property, also called warrants, namely Warrant 769 (the McLaughlin property) and Warrant 3010 (the SLT property). The subsurface rights of the McLaughlin property are currently owned by Jack E. McLaughlin and his wife, Zureya McLaughlin (the McLaughlins). The subsurface rights of the SLT

* Retired Senior Judge assigned to the Superior Court.

property are owned by SLT Holdings, LLC, with an outstanding six percent royalty interest in the OGMs owned by the McLaughlins.

On May 30, 1985, Eleanor McLaughlin, prior owner of both properties, entered into unrecorded oil and gas leases with United Land Service, Inc. (United) for both properties.[1] Relevant to this action, the lease provided that United would have ninety days to commence drilling, and if work was not commenced with reasonable diligence, United would pay Eleanor McLaughlin certain fees. Additionally, United would have to continue producing gas in paying quantities during the term of the lease. Moreover, if the wells were capable of producing gas in paying quantities, but were shut-in (ie. the lessee chooses not to produce the gas), United would pay Eleanor McLaughlin certain royalties.

Thus, by its own terms, the lease provided that United could pay shut-in gas royalties to operate to extend the lease when the well(s) were capable of producing gas in paying quantities. It follows logically that if no shut-in gas royalties were paid and the wells were capable of production, then the lease terminated. Additionally, the lease would terminate whenever OGMs were not produced in paying quantities. Furthermore, United promised to drill one well during the first year, and five additional wells each year thereafter until a total of thirty wells were drilled on the McLaughlin property

---

[1] Although the acreage and dollar figures differed for each lease, the two leases contained similar operative language; thus, we refer to one lease, although there were separate leases and lease amendments involved for each property.

and twenty wells were drilled on the SLT property. The lease would terminate if United did not drill these wells, except United would retain the twenty acres surrounding each well it had drilled.[2]

While the lease itself was not recorded, a memorandum of the oil and gas lease was signed on May 30, 1985 and recorded on June 3, 1985. The Memorandum of Oil and Gas Lease acknowledged that United had no option to renew the lease, which primary term was for five years or so long thereafter as oil or gas was produced in paying quantities or there were continuing operations on the property.

United subsequently assigned the SLT property lease and McLaughlin property lease to Mitch-Well on April 10, 1986. The lease assignments to Mitch-Well were recorded that same day. Meanwhile, the initial term of one year with which to drill on both the SLT property and the McLaughlin property was extended for a period of thirty days until June 30, 1986, giving Mitch-Well more time to drill its first well on each of the two properties. Before the initial term expired, on or about May 15, 1986, one well was drilled on both the SLT property and the McLaughlin property.

From January 17, 1991 through November 3, 2013, McLaughlin received no payments of any kind, including royalty payments, delay rental payments, or any other type of payments for the leases at issue. Similarly, Richard C. Cochran, manager of SLT Holdings, LLC, testified that neither SLT

---

[2] On February 20, 1986, the leases were amended to reduce that amount to five acres.

Holdings, nor its predecessor in interest, Sheffield Land and Timber Company, a company in which he was also involved, had ever received royalty payments, delay rental payments, or any other type of payments.

Furthermore, there was no physical indication at the 1986 well sites that the wells were either producing or capable of producing oil or gas. Additionally, a report filed by the Pennsylvania Department of Environmental Protection indicated that as early as March 27, 1990, the well sites had been abandoned.

On October 18, 2005, McLaughlin filed an Affidavit of Non-Production with respect to the McLaughlin property. Along the same lines, on February 6, 2012, Sheffield Land and Timber Company filed an Affidavit of Non-Production with respect to the SLT property. Each affidavit stated that there had been no production of oil and gas on the property at issue and that the 1986 lease had expired.

The McLaughlins conveyed their interest in the SLT property to Sheffield Land and Timber Company via deed dated June 16, 2008 and recorded on June 19, 2008. Sheffield Land and Timber Company was subsequently merged into SLT Holdings, LLC on December 18, 2012.

Utica Resources, Inc. (Utica) entered into an OGM lease with both SLT Holdings and the McLaughlins on or about March 17, 2011. The Utica leases cover the sands no deeper than 3,000 feet from the surface of the properties. Upon execution of the leases with Utica, Utica began performing

its obligations, including preparing for drilling operations, and actually drilling five wells in the first two years of the Utica leases. During this time, Utica discovered the Mitch-Well well from 1986 and attempted to pump it. The results of this attempt were not clear at the preliminary injunction hearing.

Sometime in the spring of 2013, representatives from Mitch-Well contacted Utica and advised that Utica's drilling operations on the SLT property and McLaughlin property violated Mitch-Well's rights with respect to each property. Also, Mitch-Well objected to Utica's installation of wells within the twenty acres surrounding the wells drilled in May 1986. Since being confronted by Mitch-Well, Utica has ceased its operations at the wells and the McLaughlins and SLT Holdings are not currently receiving any payments from the wells Utica drilled.

Furthermore, at some point on or about September 23, 2013, oil and gas tanks located on both properties were drained without the consent of McLaughlin, SLT Holdings, or Utica. Both McLaughlin and SLT Holdings contacted the Pennsylvania State Police. On November 4, 2013, McLaughlin received a personal check from William E. Mitchell, Jr. for royalties payable for oil removed from the McLaughlin property.[3] Included with this personal check for royalties was a purchase statement from Ergon Oil Purchasing, Inc.

---

[3] McLaughlin did not deposit the check.

(Ergon) that referenced Mitchell as Ergon's client and the sole owner of the oil and gas from the McLaughlin property. The purchase statement did not identify or otherwise designate either McLaughlin or SLT Holdings as having any ownership interest in the oil and gas sold to Ergon.

The personal check from Mitchell to the McLaughlins was the first payment the McLaughlins or their predecessors in interest received from either Mitchell or Mitch-Well for the SLT property or McLaughlin property since a few months after the wells were first drilled in May 1986. SLT Holdings received no such royalties check from Mitch-Well or Mitchell.

These events led the McLaughlins and SLT, Appellees, to file a complaint and petition for preliminary injunction against Mitchell and Mitch-Well, Appellants, on November 19, 2013. Appellees also filed a motion for expedited discovery to obtain answers to interrogatories and for production of documents. After argument, the trial court required that Appellants provide answers by January 2, 2014, and scheduled the hearing on preliminary injunction for January 23, 2014. Appellants responded to the discovery requests on January 3, 2014, and identified two individuals, William E. Mitchell, Jr. and Rick Gilmore, as witnesses. Appellees then contacted Appellants to schedule depositions of Mitchell and Gilmore, and served notices of depositions to take place on January 17, 2014. Counsel for Appellants advised Appellees that he was unavailable on that date. The depositions never occurred.

The hearing scheduled for January 23, 2014 took place. Before testimony got underway, counsel for Appellees presented two motions to the trial court. First, Appellees argued that the averments in their petition for preliminary injunction be deemed admitted because Appellants did not file an answer to the petition. The trial court denied that motion. N.T., 1/23/2014, at 10. Second, Appellees presented a motion to bar testimony and evidence. In that motion, Appellees first argued that Appellants be limited to the documents produced during discovery. The trial court granted that relief. Appellees also argued that Appellants not be permitted to present testimony of Mitchell and Gilmore because they were not deposed, even though their depositions had been noticed properly. The trial court agreed and barred the testimony of Mitchell and Gilmore. Thus, the only testimony presented at the hearing was from Richard Cochran, manager of SLT Holdings, LLC. The trial court also considered the affidavit of Jack McLaughlin. At the close of the hearing, the trial court gave the parties 10 days to submit proposed findings of fact and conclusions of law. On February 14, 2014, the trial court entered an order and opinion granting a preliminary injunction against Appellants and in favor of Appellees. Specifically, the injunction prohibited Appellants from entering onto the either parcel of property, and required Appellees to post a $500 bond. Appellants timely filed a notice of appeal, and both Appellants and the trial court complied with Pa.R.A.P. 1925.

On appeal, Appellants set forth four issues for our review, which we have renumbered for ease of disposition.

> 1. The trial court abused its discretion and committed an error of law in granting SLT's motion to deem the allegations admitted pursuant to Pa.R.C.P. 206.7.
>
> [2.] The trial court abused its discretion and committed an error of law in admitting the affidavit of Jack E. McLaughlin pursuant to Pa.R.C.P. 1531(a) [over] the hearsay objection of Mitch-Well.
>
> [3.] The trial court abused its discretion and committed an error of law in granting the motion to bar testimony from Mitch-Well as a sanction for the alleged violation of discovery.
>
> 4. The trial court abused its discretion and committed an error of law in granting the preliminary injunction in favor of SLT.

Appellants' Brief at 5.

Appellants first argue that the trial court erred in "granting" Appellees' motion to deem averments admitted. Appellants' Brief at 10. However, as both the trial court and Appellees point out, this motion was denied by the trial court. *See* N.T., 1/23/2014 at 10; Trial Court Opinion, 4/11/2014, at 2. Accordingly, there is no relief available to Appellants for this issue.

We next consider Appellants' contention that the trial court erred in considering the affidavit of Jack McLaughlin. Appellants' Brief at 18. The use of affidavits for preliminary injunctions is governed by Pa.R.C.P. 1531(a), which provides as follows.

> A court shall issue a preliminary or special injunction only after written notice and hearing unless it appears to the satisfaction of the court that immediate and irreparable injury will be sustained

> before notice can be given or a hearing held, in which case the court may issue a preliminary or special injunction without a hearing or without notice. In determining whether a preliminary or special injunction should be granted and whether notice or a hearing should be required, the court may act on the basis of the averments of the pleadings or petition and may consider affidavits of parties or third persons or any other proof which the court may require.

Pa.R.C.P. 1531(a). Thus, under the plain language of the rule, the trial court "may consider the affidavits of parties" in "determining whether a preliminary … injunction should be granted." *Id*. Accordingly, Appellants' argument to the contrary is without merit.

We now consider Appellants' argument that the trial court erred in barring the testimony of Mitchell and Gilmore. Specifically, Appellants assert that the motion was sprung on counsel just prior to the hearing, and resulted in "trial by ambush." Appellants' Brief at 15. Furthermore, Appellants assert that the trial court's decision to bar this testimony was too severe a discovery sanction under these circumstances where there "was no showing of willfulness or bad faith by testimony or correspondence." *Id*. at 17.

Pennsylvania Rule of Civil Procedure 4019 governs sanctions for discovery violations, and provides, in relevant part, as follows: "The court may, on motion, make an appropriate order if … a party or an officer, or managing agent of a party or a person designated under Rule 4007.1(e) to be examined, after notice under Rule 4007.1, fails to appear before the person who is to take the deposition[.]" Pa.R.C.P. 4019(a)(1)(iv).

[S]anctions pursuant to Pa.R.C.P. 4019 generally are imposed when a court order has been violated, although certainly the rule does allow for sanctions when there has been a discovery violation[.]… The decision whether to sanction a party, and if so the severity of such sanction, is vested in the sound discretion of the trial court. Absent a finding that the trial court abused its discretion, [the Superior] Court will not reverse an order sanctioning a party which the trial court found necessary and proper.

***McGovern v. Hosp. Serv. Ass'n of Ne. Pennsylvania***, 785 A.2d 1012, 1015 (Pa. Super. 2001) (internal citations and quotations omitted).

Instantly, Appellants did not violate a court order.[4] Moreover, Appellants were available, and the depositions did not take place because of the purported unavailability of their attorney. Additionally, Appellees could have moved the trial court to compel these depositions, but did not do so. Therefore, the penalty imposed, which resulted in Appellants not having any witnesses testify at the hearing, was particularly severe; perhaps too severe under these circumstances and an abuse of discretion.

Nonetheless, as Appellees point out, any error was harmless because "Mr. Mitchell and Mr. Gilmore would have difficulty straying from the verified responses to written discovery, which confirm they have no documents evidencing any royalty payments or attempted payments to either Appellee from 1986 through 2012." Appellees' Brief at 17. Furthermore, the trial court did not extend its prohibition against Appellants' testimony to the final

---

[4] Here, the only court order signed was Appellees' motion for expedited discovery. That motion concerned only answers to interrogatories and production of documents, not the taking of depositions.

injunction hearing. Therefore, we conclude that the trial court's abuse of discretion in barring testimony as a discovery sanction under these circumstances was harmless error, and does not require this Court to grant a new hearing on the preliminary injunction.

We now turn to Appellants' final issue, wherein they contend that the trial court erred in granting a preliminary injunction in favor of Appellees. We set forth our well-settled standard of review: "While the granting of a preliminary injunction is an extraordinary remedy, our review is narrow…. [W]e do not inquire into the merits of the controversy, but only examine the record to determine if there were any apparently reasonable grounds for the action of the court below." ***A.M. Skier Agency, Inc. v. Gold***, 747 A.2d 936, 939 (Pa. Super. 2000) (internal quotations and citations omitted).

> A petitioner seeking a preliminary injunction must establish every one of the following prerequisites; if the petitioner fails to establish any one of them, there is no need to address the others.
>
> First, a party seeking a preliminary injunction must show that an injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages. Second, the party must show that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings. Third, the party must show that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct. Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits. Fifth, the party must show that the injunction it seeks is reasonably suited to abate the

offending activity. Sixth and finally, the party seeking an injunction must show that a preliminary injunction will not adversely affect the public interest.

***Duquesne Light Co. v. Longue Vue Club***, 63 A.3d 270, 275 (Pa. Super. 2013) (internal citations and quotations omitted; emphasis added).

Appellants argue that the trial court erred not only with respect to five of the above-cited factors,[5] but also entered the preliminary injunction "out of whole cloth as the factors simply do not appear in the record." Appellants' Brief at 22. We disagree.

With respect to the first two factors, the trial court concluded that Appellants' "continuing trespass and seizure of property constitutes irreparable and immediate harm[.]" Trial Court Opinion, 2/14/2014, at 8. Furthermore, the trial court observed it is unreasonable and unjust to permit Appellants to profit from the enterprise. In response, Appellants argue that SLT never drilled a well on the property; thus, they could not be harmed by Mitch-Well's operation of the tanks. Appellants' Brief at 22-23. They also appear to argue that Appellees actually benefitted because gas is being produced.

In other words, Appellants concede that they entered onto the property in 2013, drained the gas, then sold it to Ergon. However, the record supports the trial court's conclusion that no activity had occurred on the property between 2008 and 2013. ***See*** N.T., 1/23/2014, at 29-33 (Cochran

---

[5] Appellants acknowledge that the sixth factor, regarding an adverse effect on the public interest, is not at issue here. Appellants' Brief at 25.

testifying about entering the property three to five times between 2008 and 2013 and seeing the wells in "disrepair"). Thus, Appellants' actions in entering the property, draining the tanks, and selling the gas, when it may not have had a right to do so, would undoubtedly constitute immediate and irreparable harm. Furthermore, because activity was dormant for so many years, the trial court's conclusion that halting any further activity until resolution of the rights to the OGM leases was also reasonable.

With respect to the third factor, the trial court determined that the "parties will be properly returned to the pre-litigation status quo if [Appellants'] involvement is enjoined[.]" Trial Court Opinion, 2/14/2014, at 9. Here, the status quo, as established by the record, is that there has been no drilling activity on this land for many years. Therefore, the trial court's decision to enjoin Appellants from entering the land restores the parties to the status quo as it existed before the tanks were drained.

We consider together the fourth and fifth factors. "Fourth, the party seeking an injunction must show that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits." **Duquesne Light**, 63 A.3d at 275. "Fifth, the party must show that the injunction it seeks is reasonably suited to abate the offending activity." **Id.** Instantly, the trial court concluded that Appellants "have abandoned the

property, the lease has terminated, and [Appellees] have rights to the property." Trial Court Opinion, 2/14/2014, at 9.

Appellants argue that, pursuant to the terms of the lease, they did not receive adequate notice and the opportunity to cure the alleged default. Appellants' Brief at 23. Appellants also argue that the injunction was overbroad in prohibiting entry onto the property when, in fact, they should still be permitted to enter the area around their own wells. Appellants' Brief at 24.

We bear in mind that "[a] preliminary injunction's purpose is to preserve the status quo and prevent imminent and irreparable harm that might occur before the merits of the case can be heard and determined." *Walter v. Stacy*, 837 A.2d 1205, 1209 (Pa. Super. 2003) (internal quotation omitted). Instantly, Appellants' arguments are best left for resolution at a final injunction hearing. The trial court properly prohibited Appellants from accessing these wells, because there is a dispute about who currently owns them. Moreover, whether Appellees complied with the notice of default procedures does not affect the resolution of a preliminary injunction, which only seeks to halt activity until the issues are resolved. Appellants will have the opportunity to litigate fully both of these issues at the final injunction hearing.[6]

---

[6] We note that Appellants' decision to appeal from the grant of the preliminary injunction, rather than proceed to a hearing on a final injunction, is ultimately what has delayed resolution of many of these issues.

Thus, having concluded that apparently reasonable grounds have been established by the record, we discern no abuse of discretion in the trial court's grant of a preliminary injunction in favor of Appellees and against Appellants. Accordingly, we affirm the order of the trial court.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/15/2014