J-A09024-18

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| HEALTHCARE VENTURES GROUP, LLC PHYSICIANS RX PHARMACY, LLC ITS WHOLLY-OWNED SUBSIDARY | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | : : : | |
| v. | : : : : | No. 1014 WDA 2017 |
| PREMIER PHARMACY, INC., D/B/A PREMIER PHARMACY SERVICES, GOOD HEALTH, INC. D/B/A PREMIER PHARMACY SERVICES, JOEL YERTON AN INDIVIDUAL; TODD WEBER, AN INDIVIDUAL | : : : : : : | |

Appeal from the Order Dated June 8, 2017
In the Court of Common Pleas of Allegheny County Civil Division at
No(s):  No. GD-16-023951

BEFORE:  BOWES, J., DUBOW, J., and MURRAY, J.

MEMORANDUM BY DUBOW, J.:                **FILED OCTOBER 18, 2018**

Appellants, Healthcare Ventures Group, LLC and Physicians RX Pharmacy, LLC (hereinafter "HVG"),[1] appeal from the Order entered June 8, 2017, in the Allegheny County Court of Common Pleas denying their Motion for Preliminary Injunctive Relief.[2]  After careful review, we affirm.

---

[1] Physician's RX Pharmacy is HVG's wholly-owned subsidiary.

[2] This is an interlocutory appeal as of right.  **See** Pa.R.A.P. 311(a)(4).

The relevant facts and procedural history, as gleaned from the record and the trial court's Opinion, are as follows. HVG is a pharmacy services provider that specializes in Section 340B[3] discount prescription drug programs and provides prescription medications to patients infected with HIV/AIDS and/or Hepatitis C.

Appellee Joel A. Yerton was HVG's Senior Vice President of Sales and Client Services from August 2015 to August 2016. On August 28, 2015, Yerton signed an offer letter from HVG. The letter specified that Yerton's employment was at-will and contained no restrictive covenants. Yerton's responsibilities included acquiring Section 340B covered entities as clients and overseeing all sales and client service personnel. On or around August 16, 2016, Yerton accepted an offer of employment from Appellee Premier Pharmacy Services ("Premier"), an HVG competitor.

HVG hired Appellee Todd Weber around February 1, 2016.[4] Weber reported directly to Yerton. Weber resigned from HVG on September 7, 2016 and, like Yerton, went to work for Premier.

On December 20, 2016, HVG filed a Complaint and a Motion for a Preliminary Injunction. HVG sought to: (1) immediately enjoin Weber from

---

[3] The Section 340B program refers to a section of the Internal Revenue Code that relates to the program created by the federal government to provide outpatient drugs to eligible health centers at reduced prices.

[4] Weber signed HVG's non-solicitation/non-disclosure agreement on January 15, 2016, prior to the commencement of his employment. HVG did not execute the agreement.

soliciting any contacts of HVG's until September 6, 2018; (2) order Appellees to immediately disgorge any profits derived from misappropriation of HVG's confidential information and any profits derived from soliciting HVG's contacts; (3) terminate any contracts made between Appellees and HVG's past or present clients; (4) immediately and permanently enjoin Appellees from using any confidential and proprietary information belonging to HVG; (5) immediately enjoin Appellees from issuing false and disparaging statements about HVG; and (6) award HVG interest, costs of suit, and reasonable attorneys' fees.[5]

The trial court held a two-day hearing on HVG's Motion for a Preliminary Injunction. On June 8, 2017, the court denied the Motion, finding insufficient evidence that Appellants' harm could not be remedied by money damages. The court also found that HVG failed to prove a likelihood to prevail on the merits based upon the following unresolved factual issues: (1) whether acting management decided not to implement or enforce Weber's non-solicitation agreement; (2) whether Weber's non-solicitation agreement was unenforceable because Appellees' consideration for the agreement materially changed; and (3) whether Yerton or Webster took or used any confidential information. *See* Order, 6/8/17, at 1-2 (unpaginated).

_____

[5] Appellees filed Preliminary Objections to the Complaint and HVG filed a Motion to Amend the Complaint. Following a hearing, the court overruled Appellees' Preliminary Objections and permitted HVG to file an Amended Complaint.

HVG timely appealed. Both HVG and the trial court complied with Pa.R.A.P. 1925.

HVG raises the following nine issues:

I. Did the trial court err by determining that [HVG's] harm could be remedied through money damages given that the bulk of record testimony revealed that [HVG's] harm was in the form of losing several long-term business opportunities and market advantage, which is irreversible, and can only be estimated through conjecture without accurate standards[?]

II. Did the trial court err by failing to preliminarily enjoin Appellees upon a finding that Appellants were unlikely to prevail on the merits of claims associated with the enforceability of Appellee, Todd Weber's Employee Non-Solicitation and Non-Disclosure Agreement (the "Agreement") based on the trial court's determination that there may have been a "material change" in compensation for Todd Weber ("Weber") notwithstanding the existence of record evidence—which at the time of the Appealed Order remained uncontested despite Appellees having been ordered to produce any contradicting evidence—that Weber was in fact paid all compensation due to him prior to his resignation, and further despite record evidence that Appellee, Joel Yerton, and then-acting Chief Financial Officer, Lisanna Stotts ("Stotts"), signed off on and approved final compensation and incentive pay to Weber prior to his resignation?

III. Did the trial court err by finding a potential "material change" in Weber's compensation to erode the enforceability of the Agreement even though the record evidence proved that Weber resigned on September 7, 2016, and was only entitled to a "Q3 bridge incentive payable on October 15, 2016" if Weber was, "an active Company employee meeting all eligibility requirements on the payment date of any applicable incentive payment[?]"

IV. Did the trial court err in failing to preliminarily enjoin Appellees upon deciding that Appellants were unlikely to prevail on the merits of claims associated with the enforceability of Weber's Agreement notwithstanding the facts that (i) the Agreement was signed by Weber, the party against whom the covenants would be enforced; (ii) Weber understood the terms of the Agreement, intended to sign the Agreement, did in fact sign the Agreement,

and expected to be bound by the covenants in the Agreement; (iii) after Weber's resignation, the Agreement signed by Weber was located by [HVG's] executive assistant, Chris Wakefield[,] who found it in [HVG's] network drive, along with Weber's other personnel information, having been stored there by Stotts; (iv) according to Appellee, Joel Yerton, the purported time in which "management," *i.e.*, Stotts, elected not to enforce the Agreement was in May, June or July of 2016, more than four (4) months after Weber admitted he signed the Agreement?

V. Did the trial court err in determining that [HVG's] "acting management" decided not to implement Weber's Agreement despite the fact that the only testimony related to an alleged decision not to implement the Agreement was that an alleged discussion among Appellee Yerton and Stotts occurred more than four (4) months *after* Weber signed the Agreement[?]

VI. Did the trial court err in relying on alleged "management turmoil," as a basis to erode the enforceability of the Agreement?

VII. Did the trial court err in deciding that the enforceability of the Agreement was eroded by an alleged decision not to enforce or implement and/or "management turmoil" despite the plain language of the Agreement at Paragraphs 21 and 23, which explicitly and respectively provide:

> 21. No delay or omission by the Company in exercising any right under this Agreement will operate as a waiver of that or any other right. A waiver or consent given by the Company on any one occasion is effective only in that instance and will not be construed as a bar to or waiver of any right on any other occasion.

> 23. This Agreement may not be modified, changed or discharged in whole or in part, except by an agreement in writing signed by the Employee and the Company.

VIII. Did the trial court err in deciding that [HVG's] "acting management" had the authority not to enforce or not to implement Weber's Agreement without inquiry into: (a) Delaware law as it pertains to delegation of management authority in limited liability companies; (b) [HVG's] Operating Agreement; and (c) despite testimony indicating that no such authority had been delegated to Appellee Yerton, nor had it been delegated to then—acting Chief Financial Officer, Lisanna Stotts?

IX. Did the trial court err in failing to preliminarily enjoin Appellees upon a finding that "substantial factual questions persist[ed]" as to whether Appellees, Yerton and Weber, took [HVG's] confidential information despite record evidence that: (a) Appellees used and accessed [HVG's] confidential information in order to prepare a competitive "Project Plan" while still employed by [HVG]; (b) Appellees downloaded [HVG's] proprietary pharmacy reports with specific customers that were not shared with those customers (which contained, e.g., formulae, data and calculations for proprietary dispensing fees and administrative fees for pharmacy services) onto their personal "downloads" section of their computers even though all such reports were fully accessible on [HVG's] company drive, and despite testimony that Appellees would not have to download such reports to carry out any of their job duties; and (c) had regular access to [HVG's] pharmacy services agreements, sublease agreements, and plans for on-site pharmacy build-outs for specific customers, including: AIDS Connecticut, Inc. ("ACT"), Middletown Community Health Center, and Lifelong AIDS Alliance of Seattle, and record evidence revealed that within weeks of resigning from [HVG's] employment, Appellees Weber and Yerton sent a PSA to ACT on behalf of Appellee-Premier, that was virtually identical to the one used by them while employed by [HVG]?

HVG's Brief at 5-10 (footnotes omitted).

In the Argument section of its Brief, however, HVG presented only the following three issues:

I. [HVG's] harm-namely, the irreversible loss of three specific long-term business relationship constitutes irreparable harm, which can only be estimated through conjecture without accurate standards.

II. Appellees used [HVG's] confidential and proprietary information to improperly compete with [HVG], both while still employed with [HVG] and after.

III. The court misapplied the law in several respects as it pertains to Todd Weber's non-solicitation agreement.

Appellants' Brief at 32, 47, 51.

Pa.R.A.P. 2119(a) requires, *inter alia*, that "[t]he argument shall be divided into as many parts as there are questions to be argued . . . followed by such discussion and citation of authorities as are deemed pertinent." Pa.R.A.P. 2119(a). "The Rules of Appellate Procedure state unequivocally that each question an appellant raises is to be supported by discussion and analysis of pertinent authority. Failure to do so constitutes waiver of the claim." *Giant Food Stores, LLC v. THF Silver Spring Dev., L.P.*, 959 A.2d 438, 444 (Pa. Super. 2008) (citations omitted); Pa.R.A.P. 2119(a) and (b). Where defects in a brief "impede our ability to conduct meaningful appellate review, we may dismiss the appeal entirely or find certain issues to be waived." *Commonwealth v. Kane*, 10 A.3d 327, 331 (Pa. Super. 2010) (citations omitted); Pa.R.A.P. 2101

Here, HVG's failure to adhere to the strictures of Rule 2119(a) has hampered significantly this Court's ability to conduct meaningful appellate review of the issues HVG purports to raise. While the three Argument section headings may incorporate the lengthy, convoluted issues set forth in HVG's Statement of Questions Involved, HVG has failed to cogently set forth its argument in support of the issues raised therein and "[t]his Court will not develop arguments on . . . behalf of an appellant[.]" *Keller v. Mey*, 67 A.3d 1, 7 (Pa. Super. 2013). Moreover, our review of HVG's Brief reveals that HVG focused almost exclusively on rearguing its version of the facts that ultimately pertain to the merits of this case, without addressing—beyond conclusory statements—how the trial court erred in denying its Motion for a Preliminary

Injunction. Notwithstanding these briefing deficiencies, we will proceed to consider whether the trial court ruled appropriately because it addressed the basis for denying HVG's Motion in its Rule 1925(a) Opinion.

The following principles guide our review of an order denying injunctive relief: "The standard of review applicable to preliminary injunction matters ... is highly deferential. This highly deferential standard of review states that in reviewing the grant or denial of a preliminary injunction, an appellate court is directed to examine the record to determine if there were any apparently reasonable grounds for the action of the court below." *Duquesne Light Co. v. Longue Vue Club*, 63 A.3d 270, 275 (Pa. Super. 2013) (citation and internal quotation marks omitted).

A party must establish the following six "essential prerequisites" to obtain injunctive relief:

1. that the injunction is necessary to prevent immediate and irreparable harm that cannot be adequately compensated by damages;

2. that greater injury would result from refusing an injunction than from granting it, and, concomitantly, that issuance of an injunction will not substantially harm other interested parties in the proceedings;

3. that a preliminary injunction will properly restore the parties to their status as it existed immediately prior to the alleged wrongful conduct;

4. that the activity it seeks to restrain is actionable, that its right to relief is clear, and that the wrong is manifest, or, in other words, must show that it is likely to prevail on the merits;

5. that the injunction it seeks is reasonably suited to abate the offending activity; and

6. that a preliminary injunction will not adversely affect the public interest.

***Warehime v. Warehime***, 860 A.2d 41, 46–47 (Pa. 2004). A trial court has apparently reasonable grounds for its denial of injunctive relief where it finds that the petitioner has not satisfied any one of the "essential prerequisites." ***Id.*** at 46.

"We will interfere with the trial court's decisions regarding a preliminary injunction only if there exist no grounds in the record to support the decree, or the rule of law relied upon was palpably erroneous or misapplied. It must be stressed that our review of a decision regarding a preliminary injunction does not reach the merits of the controversy." ***Santoro v. Morse***, 781 A.2d 1220, 1225 (Pa. Super. 2001).

In the first issue HVG raised in its Statement of Questions Involved, HVG claims that the court erred in concluding that money damages could remedy its harm, which rendered injunctive relief unnecessary. HVG posits that its damages "can only be estimated through conjecture without accurate standards." HVG's Brief at 5.

Contrary to HVG's claim, at the hearing on the Motion for a Preliminary Injunction, HVG's Chief Executive Officer, Jacob Sacks, testified on cross-examination that he could, in fact, calculate the amount of money HVG lost as a consequence of Appellees' alleged conduct. In particular, Sacks testified, in relevant part, as follows:

Q: [D]o you know how much money that you are saying you lost? You can calculate that figure, can't you?

*** 

Q: You can calculate that amount?

A: You are saying I would be able to calculate?

Q: Yes.

A: Generally speaking, if I sat down and worked it out, I would be able to, based on my knowledge in the industry and clients, yeah.

Q: You would be able to come up with a figure of what you would call your damages, right?

A: I would guess so, yes.

N.T., 3/9/17, at 61.

In its Rule 1925(a) Opinion, the trial court highlighted this testimony and specifically opined that "to the extent that [HVG] suffered any harm, it is not irreparable. The CEO of the company testified to his ability to calculate money damages." Trial Ct. Op., 10/18/17, at 9 (unpaginated).

We agree with the trial court that Sacks's testimony provided grounds to support its conclusion that HVG failed to establish the first of the "essential prerequisites" for obtaining a preliminary injunction, *i.e.*, that HVG's harm could not be adequately compensated by money damages. Thus, the trial court did not err in denying HVG's Motion for a Preliminary Injunction.

In light of this disposition, we need not address HVG's remaining issues.

Order affirmed.

Judge Murray joins the memorandum.

Judge Bowes concurs in result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/18/2018